**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| INSTITUTIONAL SHAREHOLDER SERVICES INC., 702 King Farm Blvd., Ste. 300 Rockville, MD 20850 *Plaintiff,* v. KEN PAXTON, in his official capacity as the Texas Attorney General, 300 West Fifteenth St. Austin, TX 78701 *Defendant.* | Civil Action No. 1:25-cv-01160 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Institutional Shareholder Services Inc. (ISS) brings this Complaint to challenge a newly enacted Texas statute, S.B. 2337, that, if allowed to take effect, will subject ISS and other firms that provide proxy advisory services to burdensome regulatory requirements for the act of giving investment advice that Texas does not like.  Because the law takes effect on September 1, 2025—and threatens ISS with ruinous fines—**ISS respectfully requests a decision on its forthcoming motion for a preliminary injunction by September 1, 2025.**

**PRELIMINARY STATEMENT**

1.    With 40 years of corporate governance expertise, Plaintiff ISS is a leading proxy adviser that provides services to meet market demand from institutional investors for corporate governance and investing solutions.  A proxy adviser is an independent third-party firm that sophisticated institutional investors hire to provide information, advice, and recommendations to

help investors decide how to vote on board elections, shareholder proposals, and other shareholder votes.

2.     Before proxy advisers like ISS entered the market, institutional investors often followed the so-called Wall Street Rule ("vote with management or sell") because it was too expensive and time-consuming to inform themselves about thousands of shareholder votes across all the companies in their investment portfolios.  That changed after ISS, in the 1980s, became the first proxy adviser.  ISS' services allowed institutional investors to "get objective, sophisticated, well-researched opinions about proxy issues," George W. Dent, Jr., *A Defense of Proxy Advisors*, 2014 Mich. St. L. Rev. 1287, 1289 (2014), thus helping institutional investors to make their own informed decisions about how to vote their shares in line with their own investing priorities and preferences.  For each shareholder vote, ISS analyzes relevant data, reviews voluminous proxy materials, and provides its clients with a report that provides extensive information about the vote at issue and makes recommendations according to criteria that are selected by its investor clients to fit their specific needs and priorities regarding corporate governance matters.

3.     ISS is registered as an investment adviser with the U.S. Securities and Exchange Commission ("SEC") under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq* ("Advisers Act").  As such, ISS owes its clients fiduciary duties of care and loyalty.  The duty of care obligates an adviser to render advice that is in the best interests of its clients, consistent with clients' particular investment objectives, time horizons and instructions, if any.  Commission Interpretation Regarding Standard of Conduct for Investment Advisers, 84 Fed. Reg. 33,669, 33,672-73 (July 12, 2019).  The duty of loyalty obligates the adviser not to subordinate its clients' interests to its own.  This means that the adviser "must eliminate or at least expose through full and fair disclosure all conflicts of interest which might incline an investment adviser— consciously

or unconsciously—to render advice [that is] not disinterested." *Id.* at 33,676. "To meet its duty of loyalty, an adviser must make full and fair disclosure to its clients of all material facts relating to the advisory relationship." *Id.* at 33,675. Consistent with its fiduciary duties, ISS' investment advice is geared towards each client's investment objectives. Those objectives may include, among other things, corporate governance interests such as maintaining strong shareholder rights and seeking robust corporate disclosure policies and codes of conduct, an independent board of directors, and an audit committee comprised of individuals with significant financial experience. Some investors also wish to incorporate faith-based, values-based, or local community investment objectives, into their investment approach and voting choices. All of these factors, and many others, may affect the value that shareholders receive from their investments. Indeed, ISS is the leading proxy advisory firm precisely because "ISS (to a greater extent than other advisors) bases its recommendations on factors that shareholders consider important."[1]

4.      Senate Bill 2337 ("S.B. 2237") identifies particular investment objectives that the State of Texas disagrees with, labels them "nonfinancial factors," and imposes onerous regulations on proxy advisers who consider—*at their clients' request*—these objectives as part of their service of providing proxy advice *to those clients*. Among other things, S.B. 2337 forces proxy advisers to falsely inform their clients and third-party companies that the adviser's recommendation "subordinates the financial interests of shareholders to other objectives." If a proxy adviser refuses to utter that false statement, Texas law ironically deems that honesty to be a "deceptive trade practice" punishable by $10,000 fines per violation.

5.      S.B. 2337 is unconstitutional content and viewpoint discrimination, plain and simple. Texas is singling out particular speech by particular speakers because it does not like that

---

[1] Stephen Choi, *The Power of Proxy Advisors: Myth or Reality?*, 59 Emory L.J. 869, 906 (2010).

speech or the speaker.  "But a State may not interfere with private actors' speech to advance its own vision of ideological balance," *Moody v. NetChoice, LLC*, 603 U.S. 707, 741 (2024), and *especially* not when the regulation is "based on hostility—or favoritism—towards the underlying message expressed," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992).

6.     S.B. 2337 is an affront to the free-market system and the constitutional protections provided to private contracts.  The free-market system enables individuals "to order their personal and business affairs according to their particular needs and interests." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978).  Institutional investors are well within their rights to contract for recommendations *based on their own stated preferences*.  There is no justification for the State of Texas to inject itself into private dealings between sophisticated parties.  As one state senator put it, "sophisticated, institutional shareholder investors" "don't really need the State of Texas and the Attorney General babysitting them."[2]  Yet Texas has done just that: interfered with private contracts to prevent investors from receiving types of information simply because the State disagrees with its content.  At bottom, that is what S.B. 2337 is all about: ensuring that the State of Texas gets to pick and choose what counts as "good" advice.

7.     S.B. 2337 purports to justify its market puppeteering as necessary to prevent "fraud" on Texas shareholders.  But the law by its own terms is not designed to protect shareholders.  S.B. 2337 applies when the proxy advice concerns a Texas company—regardless of where the shareholders are located.  And shareholders do not need S.B. 2337 to protect their interests: ISS' clients are sophisticated institutional investors that are eminently capable of making their own decisions.  Moreover, S.B. 2337 does not address any real risk:  Proxy advisers "have

---

[2] Senate Floor Action at 1:32:25-1:32:40 (May 8, 2025), https://senate.texas.gov/videoplayer.php?vid=22094&lang=en.

no financial or governance interest in the outcome of a vote"; ISS is already comprehensively regulated under the federal Advisers Act; and any "proxy advisory firm that deceives a client or fails to act in a client's interests" is already "subject to [state] common law torts, including malpractice and fraud." *ISS v. SEC*, 718 F. Supp. 3d 7, 27-28 (D.D.C. 2024), *aff'd*, No. 24-5105, __ F.4th __, 2025 WL 1802786 (D.C. Cir. July 1, 2025).

8.     In reality, S.B. 2337 will do the *opposite* of protecting shareholders because it is designed to benefit and protect corporate boards and management, to the detriment of shareholders, whose votes serve as an important check and balance on the boards that serve those shareholders. Texas's experiment in anti-capitalism thus serves no one.

9.     For more than three decades, the SEC has recognized that inserting government regulators "into every exchange and conversation among shareholders, their advisors and other parties on matters subject to a vote certainly would raise serious questions under the free speech clause of the First Amendment."  SEC, Regulation of Communications Among Shareholders, 57 Fed. Reg. 48,276, 48,279 (Oct. 22, 1992).  S.B. 2337 is just the latest in an unfortunate, unsuccessful, and unconstitutional chapter of States deviating from that basic principle to target proxy advisers for the content of their speech.  When Missouri recently adopted a rule that, like Texas's S.B. 2337, purported to require warnings for investment advice considering so-called "nonfinancial objectives," the district court had no trouble striking it down as violating the First Amendment, void for vagueness, and preempted by federal laws governing investment advisers. *Sec. Indus. & Fin. Mkts. Ass'n v. Ashcroft*, 745 F. Supp. 3d 783, 801 (W.D. Mo. 2024).  S.B. 2337 is no different, and this Court should likewise hold S.B. 2337 unconstitutional and preempted.

## PARTIES

10.     Plaintiff Institutional Shareholder Services Inc. (ISS) is a corporation organized in Delaware with its principal place of business at 702 King Farm Blvd., Suite 300, Rockville, MD 20850.  ISS is a registered investment adviser with the SEC under the Advisers Act and supplies proxy voting advice and other forms of investment advice to institutional investors.

11.      Defendant Ken Paxton is the Texas Attorney General and is responsible for enforcing S.B. 2337.  *See* S.B. 2337, §§ 6A.201, 6A.202(b); Tex. Bus. & Com. Code § 17.47.  He is sued in his official capacity.  Defendant Paxton maintains an office at 300 West Fifteenth Street, Austin, TX 78701.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a) because Plaintiff's claims arise under the United States Constitution, as well as the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988.

13.     This Court has authority under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), to decide this dispute and award relief because it presents an actual case or controversy within the Court's jurisdiction.  *See Ex parte Young*, 209 U.S. 123 (1908); *see also Computer & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1026-28 (W.D. Tex. 2024) (jurisdiction proper over lawsuit for prospective relief against Texas Attorney General in his official capacity for violations of federal law).

14.     Venue is proper in this District because the Defendant resides in this District, 28 U.S.C. § 1391(b)(1), and because substantial events material to Plaintiff's claims occurred in this District, *id.* § 1391(b)(2).

# BACKGROUND

## I.     Proxy Advisory Services

15.     Publicly traded companies are required to hold annual and special meetings to conduct business that requires shareholder approval.  At these meetings, shareholders vote on various matters, including board elections, proposals submitted by the board or by shareholders, and any other decisions for which a corporation's charter or bylaws require a shareholder vote.

16.     Matters requiring shareholder votes are compiled into a "proxy statement," which contains information about pending resolutions and other votes for upcoming shareholder meetings and are distributed to shareholders in advance.  At the meetings, shareholders, or more typically their proxies—the specified designees who vote the shares owned by particular stockholders—will vote.

17.     Corporate ballot issues range in their complexity, including everything from changing a corporate name or approving an auditor, to electing the board of directors, making key management decisions, or approving proposed mergers and acquisitions.

18.     Proposals put forth by shareholders may cover a range of topics, including issues of corporate governance, executive compensation, disclosure and transparency factors, as well as risks to the company stemming from environmental and social factors.[3]  Shareholder proposals, the results of which are typically non-binding, are a component of shareholder democracy, as they allow shareholders to express their views on significant issues facing the companies that the shareholders collectively own.  By submitting proposals and "voting their shares" in corporate elections, shareholders may influence how companies are run.

---

[3] *See generally* Subdodh Mishra, Harvard Law School Forum on Corporate Governance, *U.S. Shareholder Proposals: A Decade in Motion* (Nov. 18, 2024), https://tinyurl.com/586scy3w.

19.    Institutional investors like pension plans, asset managers, and mutual funds have vast stock holdings in multiple companies, meaning they must address a myriad of shareholder votes on complex questions across these companies.  Shareholder meetings of U.S. companies tend to be concentrated during the four-month period from March to June, which is a time period known as "proxy season."  This compressed timeline compounds the challenges associated with voting decisions.  To navigate the volume of shareholder votes and complexity of issues, institutional investors often hire independent proxy advisers to provide research and advice on how they should vote on an issue in a shareholder meeting.  A proxy adviser aggregates publicly available data, analyzes voluminous proxy materials, offers research and analysis about ballot proposals put forth by companies or shareholders, and provides voting advice in accordance with the investor client's selected criteria and priorities.

## II.    ISS And Proxy Advising

20.    Founded in 1985, ISS is a full-service proxy adviser that helps institutional investors make informed voting decisions, manage the complex process of voting their shares, and reporting their votes to stakeholders and regulators.  ISS fulfills market demand for objective and impartial advice and analysis, and its client base includes many of the world's most sophisticated institutional investors.  In 2024 alone, ISS assisted approximately 2,000 clients make and execute informed proxy voting decisions for approximately 51,500 shareholder meetings in approximately 100 developed and emerging markets worldwide.  ISS makes voting recommendations for board elections, board/management proposals, and shareholder proposals, only with respect to the companies at which its clients hold shares.  ISS does not put forth shareholder proposals nor does ISS assist any clients in formulating shareholder proposals.

21.     ISS has no interest in the outcome of a shareholder vote.  ISS does not seek to maintain or gain control of a corporation, or to win the passage (or defeat) of a ballot measure.  A proxy adviser, "although it holds itself out to attract clients, does not initiate the exchange; it provides advice only in response to the client's request."  *ISS v. SEC*, No. 24-5105, __ F.4th __, 2025 WL 1802786, at *6 (D.C. Cir. July 1, 2025).  ISS offers research and analysis to its clients to help inform their own evaluation of the proposals on which they are entitled to exercise their voting rights.  ISS is indifferent as to how shareholders ultimately choose to vote and even makes different recommendations to different investors about the same proposal if it is in each investor's best interest to do so based on the particular proxy voting guidelines each investor selects.  In some instances, ISS may even offer different recommendations about the same vote to the same client if that client has selected more than one set of voting criteria in response to the varying investment objectives of its own clients.

22.     As a registered investment adviser, ISS is subject to a comprehensive regulatory regime under the Advisers Act.  Registered advisers are subject to the Advisers Act's registration, reporting, and conduct requirements, and owe their clients fiduciary duties of care and loyalty in providing advice about how to vote their shares.  This entails a range of requirements designed to ensure that advisers render advice in their clients' best interests and do not place their own interests ahead of those of their clients.   In the proxy advisory context, these requirements include maintaining and regularly testing a comprehensive compliance program, including policies and procedures relating to proxy voting, and policies and procedures designed to eliminate or manage and disclose to clients conflicts of interest; disclosing to clients methodologies it used to render advice and actual or potential conflicts of interest; and maintaining a comprehensive set of books and records and to submit to the SEC's periodic examination.  And investment advisers are

prohibited from engaging in "any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6(4).

23.     ISS is committed to conducting business with the highest degree of ethics, integrity, and transparency. To effectuate this commitment, ISS publishes to its website its comprehensive disclosure documents (Forms ADV), the ISS Code of Ethics, the company's General Code of Conduct, and its Policy Regarding Disclosure of Significant Relationships. Together, these documents explain how ISS defines a potential conflict of interest, identifies potential conflicts, and the manner in which ISS will disclose any such conflicts to its clients.

24.     As part of its core offerings, ISS provides proxy voting recommendations based on its research and corporate governance data as applied to the proxy voting policies selected by its clients. Recommendations extend to votes on all issues that appear on the ballot for which shareholders are entitled to vote, including core issues of corporate governance, such as board of directors elections, shareholder rights, and executive compensation.

25.     ISS provides its proxy advisory services to its clients in exchange for fees. ISS' proxy advisory services meet a market need, which is why investors are willing to pay for the services. ISS does not provide proxy voting advice to any shareholder who has not specifically engaged ISS for this purpose.

A.    **ISS Offers Three Policy Frameworks: Custom, Benchmark, and Specialty Policies**

26.     In order to meet the needs of its diverse clientele, ISS offers three different types of voting policies, which are frameworks that guide ISS' proxy vote recommendations: (1) client-specific Custom Policies; (2) the Benchmark Policy; and (3) various thematic Specialty Policies.

### (1)     Custom Policies

27.     Custom Policies are designed by ISS' clients to address their unique needs and preferences.  ISS assists investors in implementing custom voting policies that investors develop, in consultation with their governance departments, boards of trustees, and portfolio managers.  A client's Custom Policy reflects the client's own specific approach to proxy voting and/or the mandates they have with the clients for whom they manage assets.

28.     By many measures, Custom Policies are the most significant category of policies at ISS.  ISS implements Custom Policies and issues Custom Policy vote recommendations for approximately 380 clients.  Approximately 86% of the shares for which ISS processes voting instructions on behalf of its clients are tied to clients' Custom Policies.

### (2)     Benchmark Policy

29.     The Benchmark Policy is a policy that ISS creates and updates each year and to which ISS clients may subscribe.  The goal of the Benchmark Policy is to promote shareholder value based on ISS' four key tenets: accountability, stewardship, independence, and transparency. The Benchmark Policy is publicly available on ISS' website.[4]  The Benchmark Policy explains in detail ISS' general framework for providing advice on particular issues and the criteria considered in making case-by-case voting decisions.

30.     ISS forms its Benchmark Policy (and its Specialty Policies) from the bottom up, through an annual review and development process that shares many similarities to federal agency notice and comment rulemaking.  ISS starts by collecting feedback from a diverse range of market participants through multiple channels: an annual policy survey of institutional investors and

---

[4] ISS, U.S. Proxy Voting Guidelines, Benchmark Policy Recommendations (updated Feb. 25, 2025), https://www.issgovernance.com/file/policy/active/americas/US-Voting-Guidelines.pdf (https://perma.cc/UR2G-EUAN).

corporate issuers, roundtables with industry groups, and ongoing feedback during proxy season. ISS' uses these inputs and ISS' expertise to develop its draft policy updates each year. ISS then publishes draft updates for an open review and comment period. Anyone can comment—including investors, companies, and the general public. ISS reviews these comments before publishing its final updated policy in November each year, to apply to meetings held after February of the following year.

31.     Much of the Benchmark Policy is designed to protect shareholders from what market participants and clients have generally deemed to be bad corporate governance practices that can harm shareholder value. For example, ISS generally recommends that shareholders vote against board nominees if the board adopted certain policies called "poison pills"—a defensive tactic to try to defeat takeover bids—without shareholder approval, because poison pills risk entrenching corporate managers unresponsive to shareholders. *See* 2025 U.S. Benchmark Policy at 14. ISS also recommends voting against "overboarded directors," meaning directors that are overextended because they sit on too many company boards. *Id.* at 12. ISS recommends voting against directors and boards that adopt provisions "materially adverse to shareholder rights," such as "supermajority vote requirements" for amending the company's bylaws or charter, or "classified board structure[s]" that divide a company's board into classes serving different term lengths, making it difficult for a single shareholder or group to gain control of the board in a given year. *Id.* at 15. And the Benchmark Policy generally recommends voting against proposals that insulate directors from removal, and in favor of proposals "to restore shareholders' ability to remove directors with or without cause." *Id.* at 22.

32.     As for so-called social and environmental proposals, the Benchmark Policy's "overall principle guiding all vote recommendations focuses on how the proposal may enhance or

protect shareholder value in either the short or long term." *Id.* at 66.  For example, when ISS applied the Benchmark Policy to proxy votes in 2024, ISS recommended voting against roughly 60% of environmental and social proposals.  In particular, the Benchmark Policy generally recommends voting against the following types of proposals:

      a.    "Generally vote against proposals seeking a company's endorsement of principles that support a particular public policy position," which "may require a company to take a stand on an issue that is beyond its own control and may limit its flexibility with respect to future developments," because "[m]anagement and the board should be afforded the flexibility to make decisions on specific public policy positions based on their own assessment of the most beneficial strategies for the company," *id.*;

      b.    "Generally vote against proposals to phase out the use of animals in product testing" when company practice is otherwise consistent with industry standards, *id.* at 67;

      c.    "Generally vote against proposals requesting that a company voluntarily label genetically engineered (GE) ingredients in its products" or "eliminate GE ingredients from the company's products," because "[t]he labeling of products with GE ingredients is best left to the appropriate regulatory authorities," *id.*;

      d.    "Generally vote against proposals regarding tobacco product warnings," which are "better left to public health authorities," *id.* at 69;

      e.    "Generally vote against proposals requesting that the company invest in renewable energy resources" or "call for the adoption of renewable energy goals," which are decisions "best left to management's evaluation of the feasibility and financial impact that such programs may have on the company," *id.* at 71;

f.    "Generally vote against proposals seeking information on the diversity efforts of suppliers and service providers" which "may pose a significant burden on the company," *id.* at 72;

g.    "Generally vote against proposals to extend company benefits to, or eliminate benefits from, domestic partners," because "[d]ecisions regarding benefits should be left to the discretion of the company," *id.* at 73.

### (3)    Specialty Policies

33.    In addition to the Benchmark Policy, ISS also offers seven thematic policy frameworks called Specialty Policies that evaluate governance issues from perspectives of sustainability, socially responsible investing, public funds, climate, labor unions, and mission or faith-based investing.  As with the Benchmark Policy, ISS publishes the Specialty Policies on its website.[5]  The Specialty Policies are intended to address common client preferences when it comes to certain strategic, policy, and social issues.  The creation of these policies was driven not by ISS' independent identification of issues it deems important, but rather by client demand for coverage tailored to their needs and their determinations of the factors that increase shareholder value.

34.    For example, ISS developed its Global Board-Aligned Policy in direct response to market demand for voting recommendations that generally defer to board judgment, including on environmental and social issues.[6]  The Global Board-Aligned Policy thus uses a "presumption on environmental and social topics that the board's recommendations should generally prevail"; the policy generally recommends voting against shareholder proposals that request the company to

---

[5] ISS, Voting Policies, 2025, https://www.issgovernance.com/policy-gateway/voting-policies/ (last visited July 23, 2025) (select "Specialty Policies" tab).

[6] ISS, U.S. Global Board-Aligned Proxy Voting Guidelines, 2025 Policy Recommendations (Feb. 6, 2025), https://www.issgovernance.com/file/policy/active/specialty/Global-Board-Aligned-US-Voting-Guidelines.pdf (https://perma.cc/Q9UQ-EBD3).

disclose reports of the company's levels of greenhouse-gas emissions or its reduction targets. U.S. Global Board-Aligned Policy at 60.

35.    As another example, ISS' Catholic Faith-Based Policy generally takes as its "frame of reference policies and proposals promulgated by the Catholic Bishops' Pastoral on economics, the Socially Responsible Investment Guidelines adopted by the Bishops, and the policies developed by members of the Interfaith Center on Corporate Responsibility."[7] U.S. Catholic Faith-Based Policy at 9. This policy recognizes faith-based investors' "dual objectives: financial and social." *Id.* These faith-based investors "invest for economic gain, as do all investors, but they also require that companies in which they invest conduct their business in a socially and environmentally responsible manner." *Id.*

**B.    ISS Applies Its Client's Chosen Framework To Provide Advice On Proxy Votes**

36.    ISS' Benchmark, Specialty, and Custom Policies detail ISS' frameworks for addressing corporate governance issues. When clients select these policies, they ask ISS to apply the policy they selected to the matters on the ballot at a particular upcoming shareholder meeting. ISS then provides clients with reports summarizing its research and providing voting recommendations based on the particular policy or policies to which each client subscribes.

37.    ISS looks at each proposal on the ballot, pulls relevant information and data, and then analyses the proposal and data through the prism of the applicable policy to come up with a voting recommendation. ISS does not determine which issues appear on a proxy ballot or the ballots or agenda items on which it renders advice. It does not furnish research or make vote

---

[7] ISS, U.S. Catholic Faith-Based Policy Proxy Voting Guidelines, 2025 Policy Recommendations (updated Feb. 25, 2025), https://www.issgovernance.com/file/policy/active/specialty/Catholic-US-Voting-Guidelines.pdf (https://perma.cc/6TR4-RS7C).

recommendations at the behest of any company or shareholder proponent of a ballot proposal, nor does ISS advocate in support of (or against) any ballot item.

38.      ISS has no financial interest in the outcome of any shareholder vote and is indifferent as to whether its clients ultimately support a proposal, reject a proposal, or abstain from voting altogether.  Indeed, because ISS' clients have a wide variety of different policies and voting criteria, ISS may even provide different recommendations about the same vote, depending on the voting criteria selected by the client.  For example, ISS may advise clients using its Benchmark Policy to vote for a certain proposal, while advising clients who employ faith-based or sustainability-based voting criteria to vote against that same proposal.

### C.    Additional Services

39.      ISS also provides other services, which are sometimes performed in connection with an upcoming proxy vote and sometimes not.  These include Special Situations Research, Vote Disclosure Service, Add-On Workflow Solutions, and ESG Analysis.

## III.    Texas S.B. 2337

40.      In its crusade against what the Texas Legislature perceives to be "woke ideology" in corporate governance, Texas has recently passed several bills designed to restrict shareholder rights.

41.      For example, another law set to take effect September 1 aims to limit the influence of smaller shareholders.  It raises the threshold for shareholders to be able to submit voting proposals at certain Texas-based public companies, requiring the shareholder to own at $1 million or 3% of voting stock, disqualifying those who have held shares for less than six months, and requiring the solicitation of 67% of shareholders before a proposal can appear.  Tex. S.B. 1057; *see* Tex. Bus. & Com. Code § 21.373.

42.     Texas S.B. 2337 is cut from the same cloth.  As one of the bill's sponsors explained, S.B. 2337 targets so-called "activist shareholders who bring resolutions that are opposed by the management of the company."   5/8/25 Senate Floor Action at 1:35:07-1:35:14.   It does so by imposing onerous requirements on proxy advisers who provide recommendations to their clients based on investment objectives that Texas apparently disfavors—and slaps severe civil penalties on advisers who do not comply with the law's byzantine (and vague) requirements.   A proxy adviser that fails to comply with any aspect of S.B. 2337 is deemed to have committed a "deceptive trade practice," which is actionable by the Texas Attorney General.  *See* Sec. 6A.201.   The Attorney General may seek injunctive relief, as well as civil penalties of $10,000 per violation.

## A.     Mandated Warnings For "Nonfinancial" And Independent Advice

43.     Section 6A.101 of the law imposes onerous compliance obligations on proxy advisers when they give advice about Texas companies,[8] in two main circumstances where the law deems the advice is "not provided solely in the financial interest of the shareholders."

44.     ***So-called "Nonfinancial" Advice.***  First, S.B. 2337 labels a proxy adviser's advice to be "not provided solely in the financial interest of the shareholders" if it "is wholly or partly based on, or otherwise takes into account," any "nonfinancial factors."  The law does not provide a comprehensive definition of what counts as "nonfinancial factors," but lists four nonexclusive examples: (1) "an environmental, social, or governance (ESG) goal, factor, or investment principle"; (2) "diversity, equity, or inclusion (DEI)"; (3) "a social credit or sustainability factor or score"; or (4) "membership in or commitment to an organization or group that wholly or partly

---

[8] S.B. 2337 applies where the proxy advice concerns a publicly traded company that (1) is "organized or created" under Texas law, (2) "has its principal place of business" in Texas, or (3) is an out-of-state company that "has made a company proposal to become" a Texas company, "whether by merger, conversion, or otherwise."  Sec. 6A.001(1).

bases its evaluation or assessment of a company's value over any period on nonfinancial factors." Sec. 6A.101(a)(1); *see also* Sec. 6A.101(a)(3).

45.    ***Advice Contrary To Or "Inconsistent" With The Company Board's View.*** Second, S.B. 2337 puts a thumb on the scale in favor of company management over shareholders' interests.  S.B. 2337 automatically deems advice to be "not provided solely in the financial interest of the shareholders" when (1) the proxy adviser "advises against" a company's proposal to elect a governing person,[9] or (2) the proxy adviser recommends action on a shareholder-sponsored proposal "inconsistent" with the company board's recommendation.[10]  Sec. 6A.101(a)(2), (4).

46.    Advisers whose recommendations include the Texas Legislature's forbidden criteria are then compelled to issue a series of warnings to their clients and the Texas company that is the subject of the report and recommendations, as well as post that warning to their website. As to the clients and the Texas company that is the subject of the advice, the proxy adviser must (1) "conspicuously state[ ] that the service is not being provided solely in the financial interest of the [Texas] company's shareholders because it is based wholly or partly on one or more nonfinancial factors"; (2) must explain "with particularity" the basis of the advice; and (3) state

---

[9] S.B. 2337 contains an exception to this provision—if the proxy adviser "affirmatively states that the proxy advisory service solely considered the financial interest of the shareholders in making such advice," Sec. 6A.101(a)(4)—but S.B. 2337 ensures that this exception will never apply.  That is because under Section 6A.101(a)(1), *any* consideration of a "governance . . . goal, factor, or investment principle" is a "nonfinancial" factor that means the advice is not "solely" in shareholders' financial interests.  And voting on a particular board director will by definition consider governance goals, factors, and investment principles, such as whether the particular nominee is overboarded.

[10] The only exception is where the proxy adviser provides a comprehensive "written economic analysis of the financial impact on shareholders of the proposal," which "must include" four components: (1) "the short-term and long-term economic benefits and costs of implementing any shareholder-sponsored proposal, as written"; (2) "an analysis of whether the proposal is consistent with the investment objectives and policies of the client"; (3) "the projected quantifiable impact of the proposal, if adopted, on the investment returns of the client"; and (4) "an explanation of the methods and processes used to prepare the economic analysis."  Sec. 6A.101(c).

that "the advice subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns or undertaking additional investment risk to promote one or more nonfinancial factors." Sec. 6A.101(b)(1). The proxy adviser must also "conspicuously disclose" on the front page of its website that its services "include advice and recommendations that are not based solely on the financial interest of shareholders." Sec. 6A.101(b)(3).

### B.    Mandated Warnings For "Materially Different Advice"

47.    On top of the requirements for advice not "solely in the financial interest of the shareholders," Section 6A.102 imposes additional requirements if a proxy adviser gives "materially different" advice to clients on how to vote on a proposal.

48.    The statute defines advice as "materially different" when the proxy adviser "simultaneously" advises that (1) at least one client vote "for" and at least one client vote "against" a proposal; (2) at least one client vote "for" and at least one client "abstain" or vote "against" a nominee for a Texas company's management; or (3) at least one client vote on a proposal that is contrary to the recommendation of the Texas company's management. Sec. 6A.102(a).

49.    Unless the proxy adviser's clients have "expressly requested services for a nonfinancial purpose," the adviser is subject to additional burdens. Sec. 6A.102(b). These disclosures require the proxy adviser to provide notice "of the conflicting advice or recommendation" to (1) "each shareholder receiving the advice or recommendation"; (2) "each entity or other person receiving the advice or recommendation on behalf of a shareholder"; (3) the Texas company that is the subject of the advice; and (4) the Texas Attorney General. Sec. 6A.102(b)(2). To each of those entities, the proxy adviser must identify which of the so-called "conflicting" recommendations is "provided solely in the financial interest of shareholders." Sec. 6A.102(b)(3). The proxy adviser must also identify which of the recommendations is "supported by any specific financial analysis performed or relied on by" the proxy adviser. *Id*.

**IV.    Texas S.B. 2337 Will Result in Direct, Concrete Harms to Plaintiff ISS**

50.    S.B. 2337 is unlawful multiple times over.  It violates the First Amendment, is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment, violates the Constitution's Contracts Clause, and is preempted by federal law regulating SEC-registered investment advisers.

51.    S.B. 2337 will irreparably harm ISS by depriving ISS of its constitutional rights under the First Amendment, Fourteenth Amendment, and the Contracts Clause.  *See Book People, Inc. v. Wong*, 91 F.4th 318, 340-341 (5th Cir. 2024) ("deprivation of a constitutional right" is irreparable injury) (citation omitted).  Complying with S.B. 2337's mandated warnings will require ISS to speak a message that it strongly believes is false: that ISS' advice to its clients "subordinates the financial interests of shareholders."  Disseminating that false message will irreparably harm ISS' reputation as a trusted adviser to its clients.  If, on the other hand, ISS refuses to speak Texas's mandated script, ISS will be forced to self-censor its speech and stop serving clients seeking information about Texas businesses—or face punishing fines.

52.    ISS fundamentally disagrees with the premise of S.B. 2337.  Under S.B. 2337, any "environmental, social, or governance . . . goal, factor, or investment principle" is deemed a "nonfinancial" factor that automatically makes advice not "solely" in shareholders' financial interests.  ISS—and its clients—couldn't disagree more.  Consideration of these factors is nothing new to financial analyses.  Far from it:  They are a well-established and routine part of investors' risk and return analyses.

53.    Start with governance.  As the Fifth Circuit has recognized, "it seems obvious" that good governance practices like quorum requirements relate to "investor protection."  *All. for Fair Bd. Recruitment v. SEC*, 125 F.4th 159, 183 n.9 (5th Cir. 2024); *see also, e.g.*, *id.* at 183 ("there is

no doubt" that federal securities exchanges "may adopt corporate governance rules" designed to prevent fraud). The Federal Trade Commission and the Department of Justice have likewise recognized "the important role of investment and robust corporate governance to capital formation and economic growth." Gov't Statement of Interest at 4, *Texas v. BlackRock*, No. 6:24-cv-00437 (E.D. Tex. May 22, 2025), ECF No. 99; *see also id.* at 18 ("The Agencies reaffirm . . . the importance of . . . corporate governance."). Pursuing good corporate governance is good advice. Just apparently not in Texas.

54.    Environmental considerations can likewise affect financial value. Industrial accidents can lead to significant reputational and financial repercussions, and can lead to crackdowns by regulators that affect all industry actors. *See, e.g.*, Peter Behr, *Three Mile Island Still Haunts U.S. Nuclear Industry*, N.Y. Times (Mar. 27, 2009), https://tinyurl.com/5n7bsdth (partial meltdown of Three Mile Island nuclear plant in 1979 "stopped the U.S. nuclear power industry in its tracks"). Yet S.B. 2337 labels advice designed to avoid those risks "nonfinancial."

55.    Social factors, too, can affect financial value. One example is where certain business practices may be associated with higher risks of abusive supply chain practices, which may lead to significant monetary losses, increase litigation risk, or damage a company's reputation. *See, e.g.*, Sarah Butler, *Boohoo Investors Seek £100m In Damages After Minimum Wage Row*, The Guardian (June 6, 2024), https://tinyurl.com/yd9k533k (investors sued online fashion company for "more than £100m in compensation" after reports alleging that company suppliers were mistreating workers "caused its share price to plummet . . . more than 40% over several days, wiping more than £1.5bn off its valuation"). Other social factors, such as whether a company adequately guards against privacy and data protection risks, can also affect shareholders' financial interests. *See, e.g.*, Keman Huang, et al., *The Devastating Business Impacts of a Cyber Breach*,

Harvard Bus. Rev. (May 4, 2023), https://hbr.org/2023/05/the-devastating-business-impacts-of-a-cyber-breach ("It is well known that a cyber incident can sink an organization's stock price, especially in the short term. Publicly traded companies suffered an average decline of 7.5% in their stock values after a data breach," and "such an impact can reverberate throughout the entire supply chain, creating a ripple effect that can cause up to 26 times the loss for a company's business ecosystem."). But to Texas, advice designed to avoid those sorts of business-breaking losses is "nonfinancial."

56.    S.B. 2337 compels ISS to tell its clients, Texas companies, and the broader public that *any* consideration of *any* governance, environmental, or social factor "subordinates" shareholders' financial interests—even though both ISS and its clients fundamentally disagree.

57.    Attempting to comply with S.B. 2337's labyrinthian other requirements also harms ISS. The statute is riddled with vague terms, making it difficult for ISS to determine what is required. And if ISS guesses incorrectly, ISS faces the same ruinous fines despite its efforts.

58.    Attempting to comply with S.B. 2337 will work a severe financial hardship on ISS, even aside from the specter of devastating fines. ISS' existing systems do not have the capability to track and compare every vote for each of ISS' thousands of clients on every particular ballot issue presented in the 50,000-plus shareholder meetings that ISS covers each year. Designing a system with those capabilities—if it is even possible—would be extraordinarily expensive, require tremendous personnel resources, and likely take years to develop.

59.    S.B. 2337 also threatens ISS' client relationships, as clients with interests in Texas companies may no longer be willing to retain ISS' services if doing so means that ISS would be forced to disclose personalized advice to third parties.

60.     There is every reason to believe that Defendant Attorney General Paxton will vigorously enforce S.B. 2337 against ISS.  For one thing, S.B. 2337 was specifically designed to target "[t]he two largest proxy advisory firms"—ISS and Glass Lewis.[11]  Attorney General Paxton, too, has been vocal about his dislike of proxy advisers and ISS specifically.  In 2023, Attorney General Paxton led a group of States that sent a letter to ISS and another proxy advisory firm accusing them of violating Texas's and other States' "prohibitions on unfair or deceptive trade practices," based on the content of proxy advice that those Attorneys General view as "contrary to the financial interests" of shareholders.[12]  And Attorney General Paxton has repeatedly used Texas's consumer protection laws to target "a wide range of organizations with which he disagrees politically"—invoking the law "more than a dozen times" in recent years, and even that is "possibly an undercount."[13]

61.     S.B. 2337 specifically empowers the Attorney General to make good on his threat: The law labels the failure to comply with its compelled speech and byzantine requirements "a deceptive trade practice" that "is actionable" by the Texas Attorney General under Section 17.47 of Texas's consumer protection laws.

---

[11] Sen. Hughes, *S.B. 2337 Bill Analysis*, Texas Senate Research Center (Apr. 22, 2025), https://perma.cc/BEF9-GPGV.

[12] Letter to Gary Retelny and Kevin Cameron, Office of the Attorney General of Utah and Office of the Attorney General of Texas, at 2 (Jan. 17, 2023), https://perma.cc/NNW4-64B4.

[13] *How Ken Paxton Is Stretching The Boundaries Of Consumer Protection Laws to Pursue Political Targets*, Texas Tribune (May 30, 2024), https://www.texastribune.org/2024/05/30/ken-paxton-texas-ag-political-targets-health-care-lgbtq/.

## COUNT I
### (First and Fourteenth Amendments—Freedom of Speech)

62.     ISS incorporates all prior paragraphs of this Complaint.

63.     The First Amendment, which applies to the States through the Fourteenth Amendment, "prohibits laws 'abridging the freedom of speech.' " *Hines v. Pardue*, 117 F.4th 769, 775 & n.25 (5th Cir. 2024) (quoting U.S. Const. amend. I).  S.B. 2337 is unconstitutional on its face and as applied to ISS.

64.     ISS engages in speech and expression protected by the First Amendment when it provides independent advice, recommendations, and analysis to its clients.  *Nat'l Inst. of Fam. & Life Advocs. (NIFLA) v. Becerra*, 585 U.S. 755, 767 (2018) ("professional speech" protected by First Amendment).  Proxy advisers' speech and expression address matters of critical importance, including corporate transactions such as mergers and acquisitions, executive compensation, and a company's corporate governance policies—and is thus at the core of the First Amendment's protections.

65.     S.B. 2337 burdens protected speech and cannot survive any level of scrutiny.

66.     ***Content-based regulations***.  S.B. 2337 is a presumptively unconstitutional content-based regulation of speech.  "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  S.B. 2337 is impermissibly content based because its onerous requirements are triggered only by parsing the content of a proxy adviser's speech.  The statute applies only to specific communicative content: advice that is based "in part" on so-called "nonfinancial factors" like governance goals.  S.B. 2337 thus " 'on its face' draws distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 163-164.  And enforcement of S.B. 2337 would necessarily require the Texas Attorney General to examine the content of ISS' speech

to determine if the disclosure requirements applied.  *See McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (a law is "content based if it required enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred") (citation and quotation marks omitted).

67.    S.B. 2337 is also impermissibly content-based because it is "aimed at particular speakers." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).  It imposes unique requirements on a specific type of speech (proxy advisory services) and class of speakers (proxy advisers that give advice "for compensation") based on Texas's desire to elevate the viewpoints of other speakers (Texas companies):  One of S.B. 2337's stated purposes is to mandate disclosures in order to provide those Texas companies the opportunity "to provide relevant information to shareholders."  Sec. 1(5).  A proxy adviser is exempted from S.B. 2337's oppressive burdens if the adviser agrees *not to be paid* for its services, Sec. 6A.001(3), even though blackletter law holds that "the First Amendment extends to all persons engaged in expressive conduct, *including those who seek profit*," *303 Creative LLC v. Elenis*, 600 U.S. 570, 600 (2023) (emphasis added).

68.    S.B. 2337's content- and speaker-based distinctions demand strict scrutiny.  *See Students Engaged in Advancing Texas v. Paxton*, 765 F. Supp. 3d 575, 594 (W.D. Tex. 2025) (Pitman, J.) ("strict scrutiny applies" to Texas social media law "because the law regulates [digital service providers] based on the content of their speech and the identity of the speaker"), *appeal pending*, No. 25-50096 (5th Cir.).

69.    ***Viewpoint discrimination***.  Making matters worse, S.B. 2337 engages in viewpoint discrimination.  "[V]iewpoint discrimination strikes at the very heart of the First Amendment," and "when the government targets particular views taken by speakers on a subject, the violation of the First Amendment is blatant."  *Morgan v. Swanson*, 659 F.3d 359, 401, 403 (5th Cir. 2011)

(citations, quotation marks, and alterations omitted).  S.B. 2337 engages in numerous forms of viewpoint discrimination.  It favors pro-corporate management speech, while penalizing speech that opposes corporate management:  Onerous disclosure provisions are triggered if the proxy adviser's advice is "inconsistent with the voting recommendation of the board of directors" or "advises against a company proposal," but not if the advice is consistent with the board's recommendation or advises voting in favor of the company proposal.  Sec. 6A.101(a)(2), (4). Other aspects of S.B. 2337 are similarly viewpoint-based, imposing burdens based on the law's view of what counts as a "nonfinancial factor," even if the proxy adviser and client disagree.  Texas may be perturbed by what it deems "shareholder activism," but "a State may not interfere with private actors' speech to advance its own vision of ideological balance." *Moody*, 603 U.S. at 741. Nor may it "burden the speech of others in order to tilt public debate in a preferred direction." *Sorrell*, 564 U.S. at 578-579.

70.    ***Compelled speech***.  S.B. 2337 compels proxy advisers to say that commonsense investment strategies and objectives are "nonfinancial factors" that "subordinate[ ] the financial interests of shareholders"—even where the proxy adviser strongly believes that statement to be false.  And S.B. 2337 does so in an area that the bill's sponsor admitted involves speech on "political hot button issues."[14]  S.B. 2337 thus "seeks to force" a proxy adviser "to utter what is not in [its] mind about a question of political . . . significance." *303 Creative*, 600 U.S. at 596 (citation and quotation marks omitted).  That is "something the First Amendment does not tolerate." *Id.*; *see also W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe

---

[14] House Committee on Trade, Workforce & Economic Development at 1:14:06-1:14:09 (Apr. 23, 2025), https://house.texas.gov/videos/21855.

what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.").

71.  ***Strict scrutiny.***  Viewpoint discrimination is never permissible.  *See Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) ("The Court's finding of viewpoint bias end[s] the matter."). And "government-compelled speech inherently regulates speech on the basis of its content" and is reviewed "under strict scrutiny unless they come within an exception such as the commercial speech exceptions of *Zauderer* or *Central Hudson*."  *R J Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 876 (5th Cir. 2024).

72.  Neither exception applies.  *Zauderer* is limited to laws requiring disclosure of "purely factual and uncontroversial information about the terms under which services will be available."  *NIFLA*, 585 U.S. at 768-769 (citation, quotation marks, and ellipses omitted).  S.B. 2337 does not require "purely factual and uncontroversial" disclosures about the "terms" of ISS' services; rather, S.B. 2337 requires ISS to utter false statements.  The *Central Hudson* test for commercial speech also does not apply.  The "test for identifying commercial speech" is whether the speech "propose[s] a commercial transaction."  *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 473-474 (1989) (citation omitted).  ISS' proxy advice does not propose a commercial transaction; instead, ISS is simply giving advice as to how its clients should vote on commercial transactions proposed by others.

73.  S.B. 2337 is therefore subject to strict scrutiny, meaning it can be "justified only if the government proves" it is "narrowly tailored to serve compelling state interests."  *NIFLA*, 585 U.S. at 766.  S.B. 2337 is not "the rare case" meeting that standard.  *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015) (citation omitted).

74.    S.B. 2337 is not narrowly tailored to any compelling interest.  S.B. 2337 justifies its requirements as "necessary in order to prevent fraudulent or deceptive acts and practices" in Texas.  But the sophisticated investors that are proxy advisers' clients are perfectly capable of reviewing proxy materials, plus any analyses and voting recommendations from the proxy adviser, and making their own decisions about how to vote—without Texas's burdensome and unnecessary intervention in the process.  *See United States v. United Foods, Inc.*, 533 U.S. 405, 411 (2001) (explaining that, under the First Amendment, "[t]he general rule is that the speaker and the audience, not the government, assess the value of the information presented") (citation omitted).  And ISS is already subject to comprehensive regulation under the Advisers Act, which prohibits fraud, 15 U.S.C. § 80b-6(2), (4), as does Texas law, *see* Tex. Bus. & Com. Code § 17.46.  Such "antifraud provisions provide adequate protection against fraudulent and deceptive communications to shareholders."  57 Fed. Reg. at 48,278-79.

75.    Nor can S.B. 2337 be justified as providing the companies that are the subject of ISS' recommendations the chance to respond to ISS' speech.  The unconstitutionality of forcing a publication to grant the subjects of its criticism a "right of reply" is a long-settled issue.  *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974).  And, as the SEC has long recognized, the proxy voting process is "better served by promoting free discussion, debate and learning among shareholders and interested persons, than by placing restraints on that process to ensure that management has the ability to address every point raised in the exchange of views."  57 Fed. Reg. at 48,279.

76.    The lack of any legitimate purpose is particularly plain given that S.B. 2337 punishes proxy advisers for complying with federal law:  The Advisers Act "requires an investment adviser to provide investment advice in the best interest of its client, *based on the*

*client's objectives*," meaning that the investment adviser must "*adopt the principal's goals, objectives, or ends*."  84 Fed. Reg. at 33,671 (emphases added).  S.B. 2337 demonizes proxy advisers for considering the factors that proxy advisers have deemed relevant to clients' financial best interests, consistent with their fiduciary duties.

77.     By "regulating the content of professionals' speech," S.B. 2337 "poses the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information."  *See NIFLA*, 585 U.S. at 771 (citation, quotation marks, and alteration omitted).

78.     ***Intermediate scrutiny.***  S.B. 2337 is unconstitutional under any level of scrutiny.  Even if intermediate scrutiny applied, Texas cannot show that "the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest."  *Sorrell*, 564 U.S. at 571-572.  S.B. 2337 seeks to chill proxy advice that Texas disagrees with for political reasons.  *See Moody*, 603 U.S. at 740 (a "substantial governmental interest" must be "unrelated to the suppression of free expression") (citation omitted).  And S.B. 2337's onerous requirements and compelled statements are too disconnected from any purported anti-fraud goal.  Therefore, even if S.B. 2337 regulated commercial speech, it would "unconstitutionally compel[ ] commercial speech."  *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 284 (5th Cir. 2024), *aff'd on other grounds*, 145 S. Ct. 2291 (2025).

79.     ***Defects not severable.***  Because S.B. 2337's unconstitutional content- and viewpoint-based triggering provisions and compelled speech requirements are integral to the entire law, the entire law must be invalidated.  Unless invalidated and enjoined, S.B. 2337 will deprive ISS of its First Amendment rights and cause it to suffer irreparable injuries.

## COUNT II
### (First and Fourteenth Amendments—Due Process—Void for Vagueness)

80.    ISS incorporates all prior paragraphs of this Complaint.

81.    Under the Fourteenth Amendment's Due Process Clause, a state law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement.  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-254 (2012). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."  *Id.* at 253-254.

82.    S.B. 2337 is unconstitutionally vague on its face and as applied to ISS.  It is vague in the conditions that trigger S.B. 2337's burdensome disclosure requirements, and once those requirements are triggered, it is vague about what proxy advisers within its reach, including but not limited to ISS, are supposed to do.[15]

83.    S.B. 2337 "fails to define key categories" that trigger the disclosure requirements. *Students Engaged*, 765 F. Supp. 3d at 602.  For example, there is no definition of what qualifies as "nonfinancial factors" triggering disclosure or what it means for advice to be "solely" in the financial interest of shareholders, versus advice that is "partly based on, or otherwise takes into account, one or more nonfinancial factors."  Nor is it clear what it means for a client to have "expressly requested services for a nonfinancial purpose," which would relieve proxy advisers of at least some requirements.  Sec. 6A.102(b).

---

[15] While the bill's primary interest is in the activities of "proxy advisory firms" including ISS, thousands of federally registered investment advisers that are not publicly identified as "proxy advisory firms" provide proxy voting advice and other securities analyses and reports within the definitions of S.B. 2337.  As enacted, S.B. 2337 would impact the activities of all such advisers.

84.     Once S.B. 2337's disclosure requirements are triggered, proxy advisers like ISS face innumerable potential foot faults with severe consequences.  For example, S.B. 2337 does not explain what qualifies as the requisite "conspicuous[ ]" disclosure, or how quickly a proxy adviser must provide disclosures to Texas companies to be held to have done so "immediately."  For the disclosure required in cases of so-called "materially different" advice, S.B. 2337 does not explain how a proxy adviser should choose between the recommendations it has provided to identify which one is "provided solely in the financial interest of the shareholders," when the proxy adviser strongly believes that all its recommendations are in the particular client's financial interests.

85.     Under S.B. 2337's "indefinite meanings, it is easy to see how an attorney general could arbitrarily discriminate in his enforcement of the law."  *Students Engaged*, 765 F. Supp. 3d at 602.  The vagueness of S.B. 2337 is "particularly troublesome given the penalties for failure to comply."  *Ashcroft*, 745 F. Supp. 3d at 801.  S.B. 2337 imposes quasi-criminal penalties:  The Texas Attorney General can seek civil penalties of $10,000 *per violation*, which could quickly add up to a staggering sum.  *See Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001) (regulations with "significant civil and administrative penalties, including fines and license revocation, which can be characterized as quasi-criminal," were unconstitutionally vague).

86.     The potential breadth of S.B. 2337—and the enormous consequences for failing to comply as Attorney General Paxton deems sufficient—chills proxy advisers and ISS from exercising their First Amendment speech rights by deterring them from giving advice regarding Texas companies at all.

87.     Because S.B. 2337's unconstitutionally vague provisions are integral to the entire law, the entire law must be invalidated.  Unless invalidated and enjoined, S.B. 2337 will deprive ISS of its due-process rights and cause it to suffer irreparable injuries.

## COUNT III
### (Contracts Clause)

88.     ISS incorporates all prior paragraphs of this Complaint.

89.     The Contracts Clause of Article I, section 10, clause 1 of the U.S. Constitution provides that: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."  The Contracts Clause "restricts the power of States to disrupt contractual arrangements."  *Sveen v. Melin*, 584 U.S. 811, 818 (2018).  A state law "crosses the constitutional line" if (1) it "operate[s] as a substantial impairment of a contractual relationship"—considering "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating [its] rights"—and (2) if the law is not "drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose."  *Id*. at 811-812 (citation and quotation marks omitted).

90.     S.B. 2337 substantially impairs ISS' contractual relationships with its customers without any legitimate public purpose, in violation of the Contracts Clause of the U.S. Constitution.

91.     S.B. 2337 substantially impairs ISS' contractual relationships in at least three ways.  First, S.B. 2337 expands and attaches new obligations to ISS' contractual duties.  In exchange for a fee, ISS administers Custom Policies that dictate a client's particular investment objectives.  But if ISS' contractual duties obligate it to formulate a recommendation based on investment objectives that Texas disagrees with, S.B. 2337 requires ISS to assume a host of new responsibilities.  ISS is contractually obligated to provide only the *client* with its report, but Sections 6A.101(b) and 6A.102(b) demand ISS provide its analysis to noncontractual third parties.

92.     Second, S.B. 2337 imposes new consequences on ISS for fulfilling its contractual obligations.  In particular, Section 6A.101(b)(3) requires ISS to tell its clients and "publicly and

conspicuously" post a warning on its website stating that ISS proffers advice "not based solely on the financial interest of shareholders."  Texas's compelled warning—no matter how false it is—penalizes ISS for effectuating its contractual obligations by inviting potential clients to believe the truth of that statement with drastic consequences for ISS' client base.

93.    Third, S.B. 2337 demands that ISS breach its contractual obligations of confidentiality.  Clients provide ISS with parameters or guidelines upon which ISS bases its recommendations.  These parameters are the clients' proprietary information and ISS is contractually prohibited from disclosing its clients' proprietary information.  Section 6A.101(b)(1)'s disclosure requirement forces ISS to breach this contractual obligation by providing the Texas company that is the subject of the advice an explanation detailing "with particularity, the basis of the proxy adviser's advice concerning each recommendation."  And Section 6A.101(b)(2) requires disclosures to a host of additional parties.  These requirements force ISS to reveal confidential and proprietary information of its clients, such as investment strategies and analytics, that clients provided to ISS in order to obtain their requested tailored investment advice.  That state-ordered breach of confidentiality substantially undermines the trust undergirding ISS' contractual relationships with its clients.

94.    Texas has no legitimate purpose in interfering with private parties' contractual relationships, as S.B. 2337 is not genuinely concerned with protecting against fraud.  But even if Texas's anti-fraud rationale were legitimate, S.B. 2337 is not reasonably tailored.  No anti-fraud purpose is advanced by requiring ISS to provide warnings to its clients that ISS considered the factors that its clients *asked ISS to consider*.  And requiring ISS to issue public false statements that ISS "subordinates" shareholders' financial interests runs entirely contrary to a State interest in preventing fraud.

95.    Because S.B. 2337's unconstitutional provisions are integral to the entire law, the entire law must be invalidated.  Unless invalidated and enjoined, S.B. 2337 will deprive ISS of its constitutionally protected contractual rights and cause it to suffer irreparable injuries.

**COUNT IV**
**(Supremacy Clause—Preemption)**

96.    ISS incorporates all prior paragraphs of this Complaint.

97.    Under Article VI of the United States Constitution, "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

98.    S.B. 2337 is both expressly and impliedly preempted by the federal Investment Advisers Act of 1940, as amended, and SEC regulations thereunder.

99.    S.B. 2337 is expressly preempted because it impermissibly imposes state regulation on the advisory services of federally registered investment advisers like ISS.  *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368 (1986) (state law is pre-empted when Congress "expresses a clear intent to pre-empt state law").  Thirty years ago, Congress amended the Advisers Act to expressly and broadly preempt state regulation of SEC-registered investment advisers, providing that "[n]o law of any State or political subdivision thereof requiring the registration, licensing, or qualification as an investment adviser or supervised person of an investment adviser shall apply to any" SEC-registered investment adviser, with three narrow exceptions,[16] none of which applies

---

[16] First, States retain limited licensing, registration and qualification authority over investment adviser representatives of federally registered advisers if those representatives have a place of business in the State.  15 U.S.C. § 80b-3a(b)(1)(A).  Second, States are permitted to require federally registered investment advisers to file—"solely for notice purposes"—copies of documents they file with the SEC and to pay fees.  *Id*. § 80b-3a *note*.  And third, the securities commission (or any agency or office performing like functions) of a State may "investigat[e] and bring[ ] enforcement actions with respect to fraud or deceit" against investment advisers or persons associated therewith.  *Id*. § 80b-3a(b)(2).

here.  15 U.S.C. § 80b-3a(b)(1)(A); *see* National Securities Markets Improvement Act (NSMIA), Pub. L. 104-290, 110 Stat. 3,416, 3,437 (1996).

100.    Outside of the three narrow exceptions, state regulation of an SEC-registered investment adviser is expressly "preempted because it impermissibly imposes new and different State regulatory obligations that are not required by federal law." *Ashcroft*, 745 F. Supp. 3d at 796.  That plain reading of the text is confirmed by the fact that the SEC has long understood the Advisers Act amendments to "broadly preempt state investment adviser law" for SEC-registered advisers.  SEC, Rules Implementing Amendments to the Advisers Act of 1940, 62 Fed. Reg. 28,112, 28,125-26 (May 22, 1997); *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("the longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is") (citations, quotation marks, and brackets omitted). The SEC explained shortly after Congress enacted the express preemption provision that the Advisers Act as amended preempts "*all regulatory requirements imposed by state law on Commission-registered advisers* relating to their advisory activities or services," including state "disclosure . . . requirements," such that those state regulations "no longer apply to advisers registered with the Commission."  62 Fed. Reg. at 28,125 (emphasis added).  The SEC has since reiterated that the "Advisers Act generally preempts state regulatory requirements with respect to Commission-registered investment advisers."   SEC, Revisions to Rules Implementing Amendments to the Investment Advisers Act of 1940, 63 Fed. Reg. 39,708, 39,709 (July 24, 1998); *see also* SEC, Regulation of Investment Advisers, at 8 (Mar. 2013), https://tinyurl.com/hbpzfasm ("state adviser laws are preempted for these advisers").

101.    Because S.B. 2337 purports to regulate investment advisory activities and services provided by federally registered advisers, S.B. 2337 is expressly preempted by the Advisers Act

as amended.  S.B. 2337 does not meet any of the exceptions from preemption:  S.B. 2337 has nothing to do with licensing investment adviser representatives, goes far beyond collecting fees or requiring ISS to file copies of its SEC-filed paperwork, and is plainly not an action by the Texas "securities commission" to "investigat[e] and bring[ ] enforcement actions with respect to fraud or deceit."  S.B. 2337 is therefore expressly preempted and unenforceable.

102.    S.B. 2337 is also impliedly preempted because it "contraven[es]" the Advisers Act's "division of authority between state and federal regulators."  *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); *see id.* ("A state law is preempted where . . . the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.") (citations omitted).  For example, S.B. 2337 requires SEC-registered investment advisers to disclose their clients' recommendations to the Texas companies that are the subject of the advice, as well as to the Texas Attorney General—entities that have no obligation to keep that information confidential.  By contrast, the Advisers Act subjects the same information to stringent confidentiality protections.  The SEC is statutorily obligated to protect from public disclosure any "propriety information"—that is, "sensitive, non-public information" such as "the investment or trading strategies of the investment adviser," "analytical or research methodologies," "trading data," or "software containing intellectual property."  15 U.S.C. § 80b-4(b)(10).  And Congress specified that the SEC lacks authority to require investment advisers "to disclose the identity, investments, or affairs of any client of such investment adviser," except in particular enforcement proceedings.  *Id.* § 80b-10(c).  S.B. 2337 would render that carefully articulated congressional balancing a nullity by making public the information that Congress deemed should be kept confidential.

103.    There is also "outright or actual conflict" between S.B. 2337 and federal requirements such that "compliance with both federal and state law is in effect physically impossible." *La. Pub. Serv. Comm'n*, 476 U.S. at 368.  S.B. 2337 requires an investment adviser like ISS to state that it is "subordinat[ing] the financial interests of shareholders to other objectives," even when the investment adviser believes that statement to be false.  Forcing ISS to utter false statements would force ISS to violate the Advisers Act's prohibitions on engaging in "any act, practice, or course of business which is fraudulent, deceptive, or manipulative."  15 U.S.C. § 80b-6(4); *see also id.* § 80b-6(2).  The false statements that S.B. 2337 requires also conflict with investment advisers' duties under SEC rules, which state that "[a]n investment adviser must have a reasonable belief that the advice it provides is in the best interest of the client based on the client's objectives." 84 Fed. Reg. at 33,673.  False statements are by definition not in the best interests of ISS' clients.

104.    Because S.B. 2337's preempted provisions are integral to the entire law, the entire law must be invalidated.  Unless invalidated and enjoined, ISS will suffer irreparable injuries.

**PRAYER FOR RELIEF**

105.    For the foregoing reasons, ISS prays for the following relief:

a.    Declare that S.B. 2337 is unconstitutional under the First and Fourteenth Amendments of the U.S. Constitution, both facially and as applied to ISS;

b.    Declare that S.B. 2337 is void for vagueness under the First Amendment and the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, both facially and as applied to ISS;

c.    Declare that S.B. 2337 is unconstitutional under the Contracts Clause of Article I, section 10, of the U.S. Constitution;

d.      Declare that S.B. 2337 is preempted by the Investment Advisers Act as amended and related SEC regulations, under the Supremacy Clause of Article VI of the U.S. Constitution;

e.      Declare that S.B. 2337's invalid provisions are integral to and inseverable from any surviving portion, such that S.B. 2337 must be declared invalid in its entirety;

f.      Preliminarily and permanently enjoin Defendant and his agents, employees, and all persons acting under his direction or control from taking any action to enforce S.B. 2337, including but not limited to intervention in any private right of action, *see* S.B. 2337 § 6A.202(b);

g.      Enter judgment in favor of ISS;

h.      Award ISS its reasonable costs and attorneys' fees incurred in bringing this action, under 42 U.S.C. § 1988; and

i.      Award ISS all other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Bruce D. Oakley

JESSICA L. ELLSWORTH*
  jessica.ellsworth@hoganlovells.com
DAVID M. FOSTER*
  david.foster@hoganlovells.com
JAMES YATES*
  james.yates@hoganlovells.com
SAM ZWINGLI*
  sam.zwingli@hoganlovells.com
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel: (202) 637-5600
Fax: (202) 637-5910

BRUCE D. OAKLEY (Texas Bar No. 15156900)
  bruce.oakley@hoganlovells.com
HOGAN LOVELLS US LLP
609 Main Street, Suite 4200
Houston, TX 77002
Tel: (713) 632-1420
Fax: (713) 632-1401

*pro hac vice application forthcoming

*Counsel for Plaintiff Institutional Shareholder Services Inc.*

Dated:  July 24, 2025