**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|  |  |
|---|---|
| INSTITUTIONAL SHAREHOLDER SERVICES INC., <br><br> *Plaintiff*, <br><br> v. <br><br> KEN PAXTON, in his official capacity as the Texas Attorney General, <br><br> *Defendant*. | No. 1:25-cv-01160-ADA |

**PLAINTIFF INSTITUTIONAL SHAREHOLDER SERVICES INC.'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................. 3

    A.    ISS And Proxy Advisory Services .................................................................... 3

    B.    Texas S.B. 2337 ................................................................................................ 6

ARGUMENT ...................................................................................................................... 9

I.    ISS Is Likely To Succeed On The Merits ....................................................................... 9

    A.    S.B. 2337 Violates ISS' First Amendment Rights............................................ 9

        1.    S.B. 2337 is impermissible content and viewpoint discrimination.............. 10

        2.    S.B. 2337 compels ISS' speech .................................................................. 11

        3.    S.B. 2337 fails strict scrutiny .................................................................... 12

        4.    S.B. 2337 fails any level of scrutiny ........................................................... 15

    B.    S.B. 2337 Violates ISS' Fourteenth Amendment Due Process Rights................. 16

        1.    S.B. 2337 leaves ISS guessing at how to comply ........................................ 16

        2.    S.B. 2337 all but guarantees arbitrary enforcement..................................... 18

        3.    S.B. 2337 chills protected speech ............................................................... 19

II.    The Remaining Factors Overwhelmingly Favor Preliminary Relief............................... 19

CONCLUSION.................................................................................................................... 20

EXHIBITS

    1.  Declaration of Lorraine Kelly

    2.  ISS Proxy Analysis & Benchmark Policy Voting Recommendations, United Airlines Holdings, Inc. (meeting date May 21, 2025)

# TABLE OF AUTHORITIES

Page(s)

CASES:

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023)....................................................................................................10, 12, 16

*Book People, Inc. v. Wong*,
    692 F. Supp. 3d 660 (W.D. Tex. 2023)..............................................................11, 12, 15, 18

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024) ......................................................................................20

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011).............................................................................................12, 14

*City of Chicago v. Morales*,
    527 U.S. 41 (1999)...................................................................................................18

*Connally v. Gen. Const. Co.*,
    269 U.S. 385 (1926).............................................................................................16, 17

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012).............................................................................................16, 19

*FCC v. League of Women Voters of Cal.*,
    468 U.S. 364 (1984)...................................................................................................10

*Free Speech Coal., Inc. v. Paxton*,
    95 F.4th 263 (5th Cir. 2024) ......................................................................................16

*ISS v. SEC*,
    No. 24-5105, __ F.4th __, 2025 WL 1802786 (D.C. Cir. July 1, 2025)..................................4

*ISS v. SEC*,
    718 F. Supp. 3d 7 (D.D.C. 2024) ...............................................................................13

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
    385 U.S. 589 (1967)...................................................................................................19

*Kolender v. Lawson*,
    461 U.S. 352 (1983)...................................................................................................19

*Mahmoud v. Taylor*,
    145 S. Ct. 2332 (2025) ...............................................................................................2

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024)............................................................................................14

*Nat'l Inst. of Fam. & Life Advocs. (NIFLA) v. Becerra,*
585 U.S. 755 (2018)............................................................................ 9, 12, 14-16

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015)............................................................................................10

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
487 U.S. 781 (1988)............................................................................................15

*R.J. Reynolds Tobacco Co. v. FDA,*
96 F.4th 863 (5th Cir. 2024) ..............................................................................15

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
515 U.S. 819 (1995)............................................................................................10

*Sec. Indus. & Fin. Markets Ass'n v. Ashcroft,*
745 F. Supp. 3d 783 (W.D. Mo. 2024) .........................................................17, 19

*Smith v. Goguen,*
415 U.S. 566 (1974)............................................................................................19

*Sorrell v. IMS Health Inc.,*
564 U.S. 552 (2011)..................................................................................10, 11, 14

*Students Engaged in Advancing Tex. v. Paxton,*
765 F. Supp. 3d 575 (W.D. Tex. 2025)............................................................17, 18

*Williams-Yulee v. Fla. Bar,*
575 U.S. 433 (2015)............................................................................................12

**STATUTES:**

15 U.S.C. § 80b-6
(2)....................................................................................................3, 13, 20
(4)......................................................................................................13, 20

Texas S.B. 2337
§ 1(1)...............................................................................................12, 14
§ 1(4)...............................................................................................12, 14
§ 1(5).......................................................................................................13
§ 6A.001....................................................................................................7
§ 6A.001(3)..............................................................................................10

# TABLE OF AUTHORITIES—Continued

Page(s)

§ 6A.101(a)(1).................................................................................7, 8, 10
§ 6A.101(a)(1)(A).....................................................................................17
§ 6A.101(a)(2)......................................................................................8, 11
§ 6A.101(a)(2)(A).....................................................................................17
§ 6A.101(a)(2)(B)........................................................................................8
§ 6A.101(a)(3)..............................................................................7, 10, 17
§ 6A.101(a)(4)..............................................................................8, 10, 11
§ 6A.101(b)(1)..............................................................................................8
§ 6A.101(b)(1)(A).....................................................................................18
§ 6A.101(b)(1)(B).....................................................................................17
§ 6A.101(b)(2)...........................................................................................18
§ 6A.101(b)(3)......................................................................................8, 18
§ 6A.101(c).................................................................................................8
§ 6A.102(a)...........................................................................................9, 17
§ 6A.102(a)(1)...........................................................................................10
§ 6A.102(a)(2)...........................................................................................10
§ 6A.102(a)(3)...........................................................................................11
§ 6A.102(b)...............................................................................................17
§ 6A.102(b)(2)......................................................................................9, 18
§ 6A.102(b)(3).............................................................................................9
§ 6A.201.............................................................................................7, 20
§ 6A.202(b)...............................................................................................20

Tex. Bus. & Com. Code § 17.46 .................................................3, 13, 20

Tex. Bus. & Com. Code § 17.47(c)(1)..............................................7, 19

**REGULATIONS:**

Regulation of Communications Among Shareholders, 57 Fed. Reg. 48,276
(Oct. 22, 1992) ...................................................................................13

Commission Interpretation Regarding Standard of Conduct for Investment Advisers,
84 Fed. Reg. 33,669 (July 12, 2019)....................................................5

**LEGISLATIVE MATERIALS:**

Senator Hughes, S.B. 2337 Bill Analysis, Texas Senate Research Center (Apr. 22, 2025),
https://perma.cc/BEF9-GPGV ............................................................6

Texas H.R. Comm. on Trade, Workforce & Econ. Dev. (Apr. 23, 2025),
https://house.texas.gov/videos/21855 .............................................6, 12

Texas H.R. Floor Action (May 27, 2025),
https://house.texas.gov/videos/22298 ........................... 7, 10, 13, 17-19

**TABLE OF AUTHORITIES—Continued**

Page(s)

Texas Senate Comm. on State Affs. (Apr. 24, 2025),
   https://senate.texas.gov/videoplayer.php?vid=21888&lang=en ...................................6, 11, 12

Texas Senate Floor Action (May 8, 2025),
   https://senate.texas.gov/videoplayer.php?vid=22094&lang=en ..........................................2, 6

**OTHER AUTHORITIES:**

Stephen Choi, *The Power of Proxy Advisors: Myth or Reality?*,
   59 Emory L.J. 869 (2010) ...........................................................................................................5

George W. Dent, Jr., *A Defense of Proxy Advisors*,
   2014 Mich. St. L. Rev. 1287 (2014) ............................................................................4, 6, 13

Strive, Corporate Governance, https://strive.com/corporate-governance
   (https://perma.cc/KP6R-ANYA) ...............................................................................................18

Strive, Norfolk Southern Shareholder Letter (May 7, 2024),
   https://strive.com/norfolk-southern-shareholder-letter
   (https://perma.cc/V2HF-YPFA)................................................................................................18

## INTRODUCTION

Plaintiff Institutional Shareholder Services Inc. ("ISS") moves for a preliminary injunction against Defendant Attorney General Paxton preventing enforcement against ISS of a newly enacted—and blatantly unconstitutional—Texas statute, Senate Bill 2337 ("S.B. 2237").  Because S.B. 2337 threatens ISS with substantial penalties for exercising its First Amendment rights, **ISS respectfully requests a decision on this motion by September 1**, when S.B. 2337 takes effect.

S.B. 2337 targets speech by proxy advisers like ISS.  A proxy adviser is an independent third-party firm that sophisticated institutional investors hire to provide research and recommendations to help them decide how to vote in shareholder actions for publicly traded companies.  For each shareholder vote, ISS analyzes relevant data, reviews voluminous proxy materials, provides its institutional investor clients with detailed reports, and makes recommendations according to the institutional investor client's chosen investment objectives. Because different clients have different priorities, ISS routinely offers different recommendations to different clients about the same vote, depending on each client's investment goals and voting criteria.  For example, some clients may pursue aggressive, short-term investment strategies; others are long-term buy-and-hold investors; and others make investing and voting decisions that take into account their religious beliefs.  ISS' objective in providing analyses and recommendations is to help its clients make informed voting decisions in *the client's* best interests, as defined by the client.  In 2024, ISS assisted approximately 2,000 clients in connection with voting analyses and made recommendations for 51,500 shareholder meetings in roughly a hundred developed and emerging markets worldwide.

S.B. 2337 identifies particular investment objectives the State of Texas disagrees with, labels them "nonfinancial factors," and imposes onerous regulations on proxy advisers like ISS

that consider these objectives—*at their clients' request*—as part of their services *to those clients*. The forbidden criteria include *any* governance, environmental, or social consideration.  S.B. 2337 then forces proxy advisers to falsely inform their clients, third-party companies, and the general public that the adviser's recommendation "subordinates the financial interests of shareholders to other objectives."  If a proxy adviser refuses to utter that false statement, Texas law ironically deems that honesty to be a deceptive trade practice punishable by $10,000 per violation in fines.

S.B. 2337 is an affront to the free-market system.  ISS serves sophisticated institutional investors like asset managers and mutual funds that are eminently capable of deciding whether to hire a proxy adviser and whether to accept or reject ISS' advice on any particular shareholder vote. As one state senator put it, "sophisticated, institutional shareholder investors" "don't really need the State of Texas and the Attorney General babysitting them."[1]  Yet Texas has done just that: interfered with private contracts to try to prevent institutional investors from receiving certain types of information simply because the State disagrees with its content.  If Texas has free rein to dictate "good" investment advice, nothing stops California or any other State from doing the same—and requiring dissenters to fall in line or pay the price.

ISS plainly satisfies the four-factor test for injunctive relief and is thus "entitled to a preliminary injunction."  *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2350 (2025).  ISS is exceedingly likely to succeed on the merits.  Although S.B. 2337 is unlawful for the many reasons in ISS' complaint, it is obviously unconstitutional as applied to ISS on two grounds:  S.B. 2337 violates ISS' rights to freedom of speech under the First Amendment and to due process under the Fourteenth Amendment.  S.B. 2337 burdens ISS' speech based on its content and viewpoint and

---

[1] Texas Senate Floor Action, at 1:32:25-1:32:40 (May 8, 2025), https://senate.texas.gov/videoplayer.php?vid=22094&lang=en (Senator Eckhardt).

then compels ISS to publicly disparage its own opinions. That is an anathema to the free marketplace of ideas guaranteed by the First Amendment. And S.B. 2337 is labyrinthian in its requirements, riddled with undefined terms, making it difficult for ISS to determine what is required and facilitating arbitrary enforcement by the State. That makes the law unconstitutionally vague under the Fourteenth Amendment.

The remaining preliminary-injunction factors—irreparable harm to ISS absent preliminary relief, the balance of equities, and the public interest—all squarely favor ISS. If allowed to take effect, S.B. 2337 would muzzle ISS' right to speak freely on matters of public concern, impose unrecoverable and substantial compliance costs, and inflict severe reputational damage. These harms call out for preliminary relief to safeguard ISS while this litigation proceeds.

The equities and public interest likewise favor ISS. There is no interest in enforcing an unconstitutional statute against ISS. There are already ample existing safeguards to protect shareholders, to the extent Texas asserts that interest; ISS is already subject to comprehensive regulation under the federal Investment Advisers Act, which prohibits fraud, 15 U.S.C. § 80b-6(2), (4), as does Texas law, *see* Tex. Bus. & Com. Code § 17.46. And it is in the public interest for institutional investors to obtain proxy advice on issues that they want advice on, without Texas dictating the terms of that advice.

ISS' motion for a preliminary injunction should be granted.

## BACKGROUND

### A.    ISS And Proxy Advisory Services

Publicly traded companies are required to hold annual and special meetings to conduct business that requires shareholder approval. Matters requiring shareholder votes are compiled into a "proxy statement," which contains information about pending resolutions and other votes for

upcoming shareholder meetings and are distributed to investors in advance. At the meetings, shareholders, or more typically their proxies—the specified designees who vote the shares owned by particular stockholders—will vote. *See* Declaration of Lorraine Kelly ¶¶ 6-12.

"Given the volume and complexity of those shareholder votes," institutional investors—sophisticated market participants that, in some cases, manage billions or even trillions of dollars for thousands of investors across numerous companies—"often retain proxy advisory firms to research proposals and issue voting recommendations tailored to each investor's specific criteria and investment strategy." *ISS v. SEC*, No. 24-5105, __ F.4th __, 2025 WL 1802786, at *1 (D.C. Cir. July 1, 2025). Before ISS entered the market, institutional investors often followed the so-called Wall Street Rule ("vote with management or sell") because it was too expensive and time-consuming to inform themselves about thousands of shareholder votes across all the companies in their investment portfolios. *See* George W. Dent, Jr., *A Defense of Proxy Advisors*, 2014 Mich. St. L. Rev. 1287, 1288-89 (2014). That changed after ISS, in the 1980s, became the first proxy adviser. ISS' services allowed institutional investors to "get objective, sophisticated, well-researched opinions about proxy issues," *id.* at 1289, thus helping institutional investors to make their own informed decisions about how to vote their shares in line with their own investing priorities and preferences. In 2024 alone, ISS assisted approximately 2,000 clients in connection with voting analyses and recommendations for 51,500 shareholder meetings in approximately 100 developed and emerging markets worldwide. Kelly Decl. ¶ 15.

ISS is registered as an investment adviser with the U.S. Securities and Exchange Commission ("SEC") under the Investment Advisers Act, 15 U.S.C. § 80b-1 *et seq.* Kelly Decl. ¶ 4. The Investment Advisers Act "requires an investment adviser to provide investment advice in the best interest of its client, based on the client's objectives," meaning that the investment

adviser must "adopt the principal's goals, objectives, or ends."  Commission Interpretation Regarding Standard of Conduct for Investment Advisers, 84 Fed. Reg. 33,669, 33,671 (July 12, 2019).  Consistent with its fiduciary duties, ISS' investment advice is geared towards each client's investment objectives.  Kelly Decl. ¶¶ 19-20.  Those objectives may include, among other things, corporate governance interests such as maintaining strong shareholder rights and seeking robust corporate disclosure policies and codes of conduct, an independent board of directors, and an audit committee comprised of individuals with significant financial experience.  Some investors also wish to incorporate faith-based, values-based, or local community investment objectives into their investment approach and voting choices.  *Id.* ¶¶ 18, 33.  All of these factors, and many others, may affect the value that shareholders receive from their investments.  *Id.* ¶¶ 19, 32, 45(b).  Indeed, ISS is the leading proxy advisory firm precisely because "ISS (to a greater extent than other advisors) bases its recommendations on factors that shareholders consider important."[2]

In order to meet the needs of its clientele, ISS offers three different types of frameworks that guide ISS' proxy vote recommendations: (1) client-specific Custom Policies, which are proprietary to a particular client and reflect that client's own specific approach to proxy voting; (2) the Benchmark Policy, which explains in detail ISS' general framework and advice on particular issues and the criteria that shareholders can consider in making case-by-case voting decisions; and (3) Specialty Policies, which evaluate governance issues from various thematic perspectives including faith-based or sustainable investing.  *See* Kelly Decl. ¶¶ 21-33.

For a particular upcoming shareholder vote, ISS reviews each proposal on the ballot, researches relevant information and data, and analyzes the proposal and data through the prism of the client's chosen policy framework(s) to come up with a voting recommendation on each ballot

---

[2] Stephen Choi, *The Power of Proxy Advisors: Myth or Reality?*, 59 Emory L.J. 869, 906 (2010).

issue. *Id.* ¶¶ 17-20, 34-37. Accordingly, ISS routinely offers different recommendations about the same vote to different clients depending on each client's investment goals and voting criteria. *Id.* ¶¶ 20, 24. ISS has no financial interest in the outcome of any shareholder vote and is disinterested as to whether its clients ultimately support a proposal, reject a proposal, or abstain from voting altogether. *Id.* ¶ 36. ISS simply offers research and recommendations based on the client's chosen policy or policies to help inform the client's evaluation of proposals. *Id.* ¶¶ 17, 35.

ISS' services meet a market need, which is why investors are willing to pay for them. *See A Defense of Proxy Advisors*, *supra*, at 1309 (institutional investors "subscribe to ISS's services because they trust it to provide reliable, efficient services") (citation and ellipses omitted). ISS' clients are "free to ignore its advice"—"and institutions do often ignore its advice, especially the larger institutions and especially on higher profile issues." *Id.* at 1326; *see* Kelly Decl. ¶ 19.

### B.    Texas S.B. 2337

S.B. 2337 targets ISS as one of the "two largest proxy advisory firms,"[3] which the Texas Legislature believes hold "outsized influence" in the free market.[4] The bill's sponsors lamented that ISS has at times recommended investors support proposals by so-called "activist shareholders . . . that are opposed by the management of the company,"[5] and that ISS provides advice on "political hot button issues," including "environmental, social, and governance" ("ESG") factors.[6] According to the Texas Legislature, when ISS considers factors such as "ESG" or "anything

---

[3] Senator Hughes, *S.B. 2337 Bill Analysis*, Texas Senate Research Center (Apr. 22, 2025), https://perma.cc/BEF9-GPGV.

[4] Texas Senate Comm. on State Affs., at 59:03-59:12 (Apr. 24, 2025), https://senate.texas.gov/videoplayer.php?vid=21888&lang=en (Senator Hughes).

[5] Texas Senate Floor Action, at 1:35:07-1:35:14 (May 8, 2025) (Senator Hughes).

[6] Texas H.R. Comm. on Trade, Workforce & Econ. Dev., at 1:14:03-1:14:10 (Apr. 23, 2025), https://house.texas.gov/videos/21855 (Representative Leach).

political or partisan," "that's what we want to prevent.  That's what we want to avoid."[7]

S.B. 2337 seeks to accomplish that goal by imposing onerous requirements on proxy advisers that provide recommendations to their clients regarding Texas companies[8] based on investment objectives that Texas disfavors—and slaps severe penalties on advisers that do not comply with the law's byzantine (and vague) requirements.  A proxy adviser that fails to comply with any aspect of S.B. 2337 is deemed to have committed a "deceptive trade practice," actionable by the Texas Attorney General, with civil penalties of $10,000 per violation.  *See* S.B. 2337 § 6A.201; Tex. Bus. & Com. Code § 17.47(c)(1).

***Mandated Warnings For "Nonfinancial" Or Independent Advice.***  Section 6A.101 imposes onerous obligations on proxy advisers for giving advice in two main circumstances where Texas believes the advice is "not provided solely in the financial interest of the shareholders." First, Texas labels advice as "not provided solely in the financial interest of the shareholders" if it "is wholly or partly based on, or otherwise takes into account," any "nonfinancial factors."  The law does not provide a comprehensive definition of what counts as "nonfinancial factors," but lists four nonexclusive examples: (1) "an environmental, social, or governance (ESG) goal, factor, or investment principle"; (2) "diversity, equity, or inclusion (DEI)"; (3) "a social credit or sustainability factor or score"; or (4) "membership in or commitment to an organization or group that wholly or partly bases its evaluation or assessment of a company's value over any period on nonfinancial factors."  S.B. 2337 § 6A.101(a)(1); *see also id.* § 6A.101(a)(3).

Second, S.B. 2337 puts a thumb on the scale in favor of company management over

---

[7] Texas    H.R.    Floor    Action,    at    9:48:07-9:48:22    (May    27,    2025), https://house.texas.gov/videos/22298 (Representative Leach).

[8] That includes companies incorporated in Texas, companies with a principal place of business in Texas, or companies that have proposed to become a Texas company.  S.B. 2337 § 6A.001.

shareholders. S.B. 2337 automatically deems advice "not provided solely in the financial interest of the shareholders" when (1) the proxy adviser "advises against" a company's proposal to elect a governing person,[9] or (2) the proxy adviser recommends action on a shareholder-sponsored proposal "inconsistent" with the company board's recommendation.[10] *Id.* § 6A.101(a)(2), (4).

Advisers whose recommendations include these criteria are then compelled to issue a series of warnings to their clients and the Texas company that is the subject of the report and recommendations, as well as post that warning to the proxy adviser's website. As to the clients and the Texas company that is the subject of the advice, the proxy adviser must (1) "conspicuously state[] that the service is not being provided solely in the financial interest of the [Texas] company's shareholders because it is based wholly or partly on one or more nonfinancial factors"; and (2) explain "with particularity" the basis of the advice and that "the advice subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns or undertaking additional investment risk to promote one or more nonfinancial factors." *Id.* § 6A.101(b)(1), (2). The proxy adviser must also "publicly and conspicuously disclose" on the front page of its website that its services "include advice and recommendations that are not based solely on the financial interest of shareholders." *Id.* § 6A.101(b)(3).

---

[9] There is an exception if the proxy adviser "affirmatively states" it "solely considered the financial interest of the shareholders in making such advice," S.B. 2337 § 6A.101(a)(4), but that exception will never apply in practice because *any* consideration of a "governance . . . goal, factor, or investment principle" is a "nonfinancial" factor that makes advice not "solely" in shareholders' financial interests. *See id.* § 6A.101(a)(1). And voting on a particular board director will, by definition, consider governance factors, such as whether the particular nominee is overboarded (meaning a director that sits on too many company boards and is thus overextended).

[10] The only exception is where the proxy adviser provides a comprehensive "written economic analysis of the financial impact on shareholders of the proposal," which "must include" four specific components. *Id.* § 6A.101(a)(2)(B), (c).

***Mandated Warnings For "Materially Different Advice."*** Section 6A.102 imposes additional burdens if a proxy adviser gives "materially different" advice. According to Texas, advice is "materially different" when a proxy adviser "simultaneously" advises that (1) at least one client vote "for" and at least one client vote "against" a proposal; (2) at least one client vote "for" and at least one client "abstain" or vote "against" a nominee for a Texas company's management; or (3) a client vote contrary to the recommendation of a Texas company. *Id.* § 6A.102(a).

Unless the proxy adviser's clients have "expressly requested services for a nonfinancial purpose," the adviser must notify (1) "each shareholder" receiving the advice; (2) anyone "receiving the advice or recommendation on behalf of a shareholder"; (3) the Texas company that is the subject of the advice; and (4) the Texas Attorney General. *Id.* § 6A.102(b)(2). To each of those entities, the proxy adviser must identify which of the so-called "conflicting" recommendations is "provided solely in the financial interest of shareholders," and which is "supported by any specific financial analysis performed or relied on by" the proxy adviser. *Id.* § 6A.102(b)(3).

## ARGUMENT

### I.      ISS Is Likely To Succeed On The Merits.

#### A.      S.B. 2337 Violates ISS' First Amendment Rights.

ISS engages in speech and expression at the core of the First Amendment's protections: ISS provides independent advice, recommendations, and analysis to its clients on matters of critical importance. *See Nat'l Inst. of Fam. & Life Advocs. (NIFLA) v. Becerra*, 585 U.S. 755, 767 (2018). S.B. 2337 targets ISS' protected speech based on its content and viewpoint, and compels ISS to utter false statements that denigrate ISS' own services. S.B. 2337 thus violates the Constitution's "fixed star" that "the government may not interfere with an uninhibited marketplace of ideas." *303*

*Creative LLC v. Elenis*, 600 U.S. 570, 584-585 (2023) (citation and quotation marks omitted).

**1.    S.B. 2337 is impermissible content and viewpoint discrimination.**

It "is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Speech regulations are content based if they apply "because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

S.B. 2337 plainly draws those distinctions. The law's onerous requirements apply only to certain subsets of a certain kind of speech: proxy advisory services that are even "partly based" on so-called "nonfinancial factors," as Texas idiosyncratically defines them, *see* S.B. 2337 § 6A.101(a)(1), (3); proxy advisory advice to vote "inconsistent" with or "against" company management, *id.* §§ 6A.101(a)(2), (4), 6A.102(a)(3); or proxy advisory advice that differs between clients, *id.* § 6A.102(a)(1), (2). The law is also impermissibly "aimed at particular speakers," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011), because it burdens the advice of independent proxy advisers like ISS that advise shareholders "for compensation," *see* S.B. 2337 § 6A.001(3), while exempting nonprofits and company boards that also give advice to shareholders.[11] The result is that S.B. 2337's enforcement "necessarily" requires examining "the content of the message that is conveyed" and the identity of the speaker conveying it. *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984). That is content discrimination to a tee.

Making matters worse, S.B. 2337's distinctions smack of viewpoint discrimination, a particularly "egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829. S.B. 2337 favors pro-corporate management speech, while burdening speech that opposes corporate

---

[11] *Cf.* H.R. Floor Action, at 9:35:30-9:35:38 (May 27, 2025) (amendment "clarifies that small nonprofits that happen to research and [give] stock advice are not impacted by this bill") (Representative Capriglione).

management:  ISS is subjected to onerous compliance obligations if it recommends that clients vote against or even inconsistently with the views of company management, but not if ISS recommends its clients parrot the company board.  *See* S.B. 2337 §§ 6A.101(a)(2), (4), 6A.102(a)(3).  S.B. 2337 also favors Texas's view of what is a "nonfinancial" factor, while burdening the speech of speakers like ISS that disagree with Texas's assessment.  *See* Kelly Decl. ¶¶ 19, 32, 45.

Moreover, S.B. 2337's sponsors made crystal clear that the law targets ISS because of the views they perceive ISS to hold.  *Supra*, pp. 6-7; *see also* Senate Comm. on State Affs., at 58:41-59:25 (Apr. 24, 2025) (complaining that "sadly, in recent years, proxy advisory firms have become increasingly political," and that "the two primary proxy advisory firms" are "basing their advice on ESG standards") (Senator Hughes).  That "expressed statement of purpose" makes it "apparent" that S.B. 2337 is impermissibly "aimed at a particular viewpoint."  *Sorrell*, 564 U.S. at 565.

### 2.  S.B. 2337 compels ISS' speech.

S.B. 2337 also violates ISS' fundamental right "to be free of compelled speech by the government."  *Book People, Inc. v. Wong*, 692 F. Supp. 3d 660, 690 (W.D. Tex. 2023) (Albright, J.), *aff'd in part, vacated in part on other grounds*, 91 F.4th 318 (5th Cir. 2024).  S.B. 2337 compels ISS to tell its clients, third parties, and the general public that ISS' advice "subordinates the financial interests of shareholders," even though ISS fundamentally believes that statement is false. What Texas might label "nonfinancial factors"—including *any* governance, social, or environmental consideration—ISS and its clients believe are in fact highly relevant to shareholders' financial interests.  Weak board oversight, industrial accidents, allegations of forced labor in the supply chain, and data privacy breaches all inure to a company's bottom line.  *See* ECF No. 1, Compl. ¶¶ 53-55 (collecting examples).  Requiring ISS to say otherwise is plainly compelled speech.  And it misrepresents ISS' role in providing proxy advice, which is driven by client demand

11

and indications from market participants about what is relevant to shareholder value.  Kelly Decl. ¶¶ 19, 30, 32, 45.  S.B. 2337 thus "plainly alters the content" of ISS' speech, *see NIFLA*, 585 U.S. at 766, including on "political hot button issues."[12]  The First Amendment forbids that result: "no government may affect a speaker's own message by forcing [it] to accommodate views [it] does not hold." *303 Creative*, 600 U.S. at 599-600 (citation, quotation marks, and brackets omitted).

S.B. 2337 also requires ISS to speak where ISS would otherwise "choose[] to remain silent." *See Book People*, 692 F. Supp. 3d at 689.  ISS' clients are institutional investors; ISS does not provide proxy voting advice to company management, to retail investors, or to the Texas Attorney General.  Yet S.B. 2337 would compel ISS to provide its proxy voting recommendations to all of those entities, accompanied by a state-mandated disclaimer denigrating ISS' speech as subordinating shareholders' financial interests.  ISS has the right to choose its customer base and "not provide public assessments." *Id.* at 690.

### 3.    S.B. 2337 fails strict scrutiny.

S.B. 2337 is subject to strict scrutiny, meaning it can be "justified only if the government proves" it is "narrowly tailored to serve compelling state interests." *NIFLA*, 585 U.S. at 766.  This is not "the rare case" meeting that standard.  *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015) (citation omitted).  S.B. 2337's purported justification—as necessary to protect Texas shareholders from "fraudulent or deceptive acts and practices" in Texas," S.B. 2337 § 1(1), (4)—fails.

For starters, S.B. 2337's anti-fraud rationale is not compelling because there is no "actual problem in need of solving."  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (quotation marks omitted).  The "risk that a proxy advisor's advice will deceive or mislead an ordinary, non-

---

[12] H.R. Comm. on Trade, at 1:14:06-1:14:09 (Apr. 23, 2025) (Representative Leach); *see also* Senate Comm. on State Affs., at 1:01:06-1:01:20 (Apr. 24, 2025) (complaining about proxy advice in "area where tremendous policy decisions are being made" "on so many issues that affect our daily lives") (Senator Hughes).

client shareholder is minimal," because the advice "is exclusively for the investor that hires them." *ISS v. SEC*, 718 F. Supp. 3d 7, 27 (D.D.C. 2024), *aff'd*, No. 24-5105, __ F.4th __, 2025 WL 1802786 (D.C. Cir. July 1, 2025). As for ISS' clients, sophisticated institutional investors are hardly in need of protection. ISS has "no financial or governance interest in the outcome of a vote"; its advice is "tailored to the client's interests, not [its] own." *Id*. Plus, ISS is comprehensively regulated under the federal Investment Advisers Act of 1940, as amended, and any "proxy advisory firm that deceives a client or fails to act in a client's interests" is already subject to federal and state prohibitions on fraud, not to mention state tort liability. *See id.* at 27-28; *see also* 15 U.S.C. § 80b-6(2), (4); Tex. Bus. & Com. Code § 17.46; Regulation of Communications Among Shareholders, 57 Fed. Reg. 48,276, 48,278-79 (Oct. 22, 1992) (existing rules "provide adequate protection against fraudulent and deceptive communications to shareholders").

Moreover, S.B. 2337's premise is wrong. It is not fraud for a proxy adviser to tailor advice to "different investors [that] have different investment styles, risk tolerances, investment horizons, and preferences for investments in certain geographic areas or business sectors."[13] Nor is it fraud for ISS to provide advice about how institutional investors should vote on proxy ballots to meet the investors' own goals.[14] And because ballot issues are public, companies can and already do "provide relevant information to shareholders" in advance of those votes. *See* S.B. 2337 § 1(5); *see also A Defense of Proxy Advisors*, *supra*, at 1310. Institutional investors are perfectly capable of reviewing proxy materials, company recommendations, and any analyses and voting

---

[13] H.R. Floor Action, at 9:17:48-9:18:05 (May 27, 2025) (Representative Goodwin).

[14] Sometimes clients' goals include religious considerations. For example, in a shareholder vote urging a healthcare company to report on its abortion-related activities, ISS may advise a Catholic university's endowment fund that subscribes to ISS' Catholic Faith-Based Specialty Policy to vote "YES," but a different investor with different preferences to vote "NO."

recommendations from ISS, and making their own decisions about how to vote.

State interests aside, S.B. 2337 fails on tailoring for similar reasons. S.B. 2337 is both "seriously overinclusive" and "seriously underinclusive" to any fraud-prevention goal. *Brown*, 564 U.S. at 805. It is overinclusive because no anti-fraud purpose is advanced by requiring ISS to provide false warnings to its clients that ISS considered the factors that its clients *asked ISS to consider*. And requiring ISS to make false statements about its services runs directly counter to any fraud-prevention interest.

S.B. 2337 is also "wildly underinclusive when judged against" Texas's anti-fraud justification. *Id.* at 802. S.B. 2337 professes concern for fraud in Texas on Texas shareholders, *see* S.B. 2337 § 1(1), (4), yet the law applies only to advice about Texas *companies*—regardless of where *shareholders* are located, where the proxy advice is dispensed, or where a proxy vote takes place. So S.B. 2337 is not tailored to protecting Texas shareholders at all. S.B. 2337 is also riddled with content-based and speaker-based exceptions—like whether the speech contradicts company management or is made by a nonprofit—that underscore the law's "disconnect between its stated purpose and its actual scope." *NIFLA*, 585 U.S. at 775.

In an ordinary case, such a profound mismatch "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802. There is no doubt about Texas's discriminatory aims here: S.B. 2337 was designed to suppress ISS' speech. *See supra*, pp. 6-7. Texas may be perturbed by the way that institutional investors choose to vote, but "a State may not interfere with private actors' speech to advance its own vision of ideological balance." *Moody v. NetChoice, LLC*, 603 U.S. 707, 741 (2024). Nor may it burden private speech "in order to tilt public debate in a preferred direction." *Sorrell*, 564 U.S. at 578-579.

14

### 4.    S.B. 2337 fails any level of scrutiny.

Strict scrutiny is the appropriate standard because S.B. 2337 targets ISS' core speech. "[G]overnment-compelled speech inherently regulates speech on the basis of its content," and courts "review content-based regulations of speech under strict scrutiny unless they come within an exception such as the commercial speech exceptions of *Zauderer* or *Central Hudson*." *R.J. Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 876 (5th Cir. 2024).  Neither exception applies.

For starters, S.B. 2337 does not target commercial speech, which "does no more than propose a commercial transaction." *Book People*, 692 F. Supp. 3d at 692 (citations and quotation marks omitted).  S.B. 2337 does not apply to proposing a commercial transaction; it applies to the content of ISS' advice to existing clients on matters of public concern.  S.B. 2337 thus regulates ISS' "speech as speech." *NIFLA*, 585 U.S. at 770.[15]

Even if ISS' speech were deemed commercial, the *Zauderer* standard would not apply because S.B. 2337 "is not limited to purely factual and uncontroversial information about the terms under which services will be available" in the context of "commercial advertising." *NIFLA*, 585 U.S. at 768-769 (citation, quotation marks, and ellipses omitted); *see id.* at 771 (explaining that the "statements in *Zauderer* would have been 'fully protected' if they were made in a context other than advertising") (citation omitted).  Needless to say, ISS' private speech to its clients providing recommendations about how to vote in shareholder elections is not "commercial advertising."  And forcing ISS to say that it "subordinates" its clients' financial interests is about as far from "purely factual and uncontroversial" as one can get.  S.B. 2337 is also "unjustified [and] unduly burdensome." *Id.* at 768.  Far from "an incidental burden on speech," S.B. 2337 "seeks to force"

---

[15] And even if some aspect of S.B. 2337 applied to commercial speech, it would be "inextricably intertwined with [ISS'] otherwise fully protected speech." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988).

ISS "to utter what is not in [its] mind about a question of political . . . significance," which "the First Amendment does not tolerate," *303 Creative*, 600 U.S. at 596 (citation and quotation marks omitted), and it threatens to "chill [ISS'] protected speech," *NIFLA*, 585 U.S. at 778.

The *Central Hudson* test also does not apply. "*Central Hudson* dealt only with *restrictions* on commercial speech, not *compelled* speech." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 283 & n.64 (5th Cir. 2024), *aff'd on other grounds*, 145 S. Ct. 2291 (2025). Strict scrutiny should apply to S.B. 2337's unlawful compelled speech. *Cf. NIFLA*, 585 U.S. at 771. In any event, S.B. 2337 would fail even *Central Hudson*'s intermediate scrutiny: ISS' speech concerns lawful activities, Texas's anti-fraud interest is pretextual, and S.B. 2337 does not adequately tailor its requirements to that supposed interest. *See Free Speech Coal.*, 95 F.4th at 283-284. The "wildly underinclusive[ness]" of S.B. 2337 means it "cannot survive even intermediate scrutiny." *NIFLA*, 585 U.S. at 773-774. Texas cannot show that compelling ISS to utter false statements will advance the State's purported interest in preventing fraud. And Texas had "numerous and obvious less-burdensome alternatives" to advance Texas's view of "good" financial advice, including "a government-funded public information campaign." *Free Speech Coal.*, 95 F.4th at 284.

### B.    S.B. 2337 Violates ISS' Fourteenth Amendment Due Process Rights.

A state law is void for vagueness under the Fourteenth Amendment's Due Process Clause if it (1) fails to give "fair notice of conduct that is forbidden or required," or (2) "authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation omitted). S.B. 2337 is unconstitutional under either metric.

### 1.    S.B. 2337 leaves ISS guessing at how to comply.

S.B. 2337 is void for vagueness because it fails to "inform those who are subject to it what conduct on their part will render them liable to its penalties." *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926). S.B. 2337 is vague both on the front end—in what triggers the law's

burdensome obligations—and on the back end—in what ISS must do to comply.

On the front end, S.B. 2337 "fails to define key categories" that trigger the law's coverage. *Students Engaged in Advancing Tex. v. Paxton*, 765 F. Supp. 3d 575, 602 (W.D. Tex. 2025); *see* Kelly Decl. ¶ 44. To name just a few: Is proxy advice "inconsistent" with the board's recommendation if the board has not given a recommendation? *See* S.B. 2337 § 6A.101(a)(2)(A). What is a "nonfinancial" factor? What is a "governance" "goal, factor, or investment principle"? What qualifies as a client "expressly request[ing] services for a nonfinancial purpose," or ISS "simultaneously" advising multiple clients? S.B. 2337 defines none of these terms, nor are they "words or phrases having a technical or other special meaning" or "a well-settled common-law meaning." *Connally*, 269 U.S. at 391. Indeed, S.B. 2337 uses phrases like "nonfinancial" idiosyncratically. On the one hand, S.B. 2337 recognizes that mitigating "investment risk" is in shareholders' financial interests. *See* S.B. 2337 § 6A.101(a)(3), (b)(1)(B). On the other, S.B. 2337 automatically labels advice as "nonfinancial" if it considers any "environmental, social, or governance" "factor," *even if that advice is designed to mitigate investment risk*. *Id.* § 6A.101(a)(1)(A). Another court recently ruled that the term "nonfinancial" was unconstitutionally vague for similar reasons, including that it left "many concepts . . . unexplained." *Sec. Indus. & Fin. Markets Ass'n v. Ashcroft*, 745 F. Supp. 3d 783, 800 (W.D. Mo. 2024). The result is that proxy advisers like ISS "must necessarily guess" at the scope of S.B. 2337's coverage. *Connally*, 269 U.S. at 391.

On the back end, once triggered, proxy advisers like ISS face innumerable potential foot faults—with draconian penalties—in attempting to comply with S.B. 2337's "administratively burdensome" requirements.[16] *See also* Kelly Decl. ¶¶ 44, 46. For example, S.B. 2337 does not

---

[16] H.R. Floor Action, at 9:39:21-9:39:25 (May 27, 2025) (Representative Goodwin).

explain what counts as a "conspicuous[ ]" disclosure, *see* S.B. 2337 § 6A.101(b)(1)(A), (3); how quickly ISS must act to "immediately" provide disclosures to Texas companies, *id.* § 6A.102(b)(2); or how and to whom ISS could provide a disclosure "to the [Texas] company that is the subject of the service," *id.* § 6A.101(b)(2), if ISS' research did not focus on any particular company.  *See* Kelly Decl. ¶ 44(g), (j), (n).  These "many important questions are left unanswered and unaddressed by the statute."  *Book People*, 692 F. Supp. 3d at 698.  S.B. 2337's failure to define its liability-assigning terms renders the statute unconstitutionally vague as applied to ISS.

### 2.   S.B. 2337 all but guarantees arbitrary enforcement.

S.B. 2337 is also void for vagueness because it fails to "establish minimal guidelines to govern law enforcement."  *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (citation and quotation marks omitted).  For the same reasons that ISS is left guessing at S.B. 2337's scope and requirements, the law's various "indefinite meanings" make it "easy to see how an attorney general could arbitrarily discriminate in his enforcement."  *Students Engaged*, 765 F. Supp. 3d at 602.

S.B. 2337's potentially boundless scope exacerbates the problem.  *See City of Chicago*, 527 U.S. at 60 (recognizing inherent vagueness in a law's "broad sweep").  As one legislator pointed out, S.B. 2337 appears to apply to proxy advisory services that "align with Texas's anti-ESG stance."[17]  For example, a self-styled "anti-ESG" firm called Strive provides proxy advice based on numerous "corporate governance" "principles,"[18] including that "Strive opposes corporate pursuit of voluntary environmental goals that government regulators have declined to impose."[19]  That certainly sounds like advice at least "partly based on" a "governance" or

---

[17] H.R. Floor Action, at 9:37:10-9:37:15 (May 27, 2025) (Representative Goodwin).

[18] Strive, Corporate Governance, https://strive.com/corporate-governance (https://perma.cc/KP6R-ANYA).

[19] Strive, Norfolk Southern Shareholder Letter (May 7, 2024), https://strive.com/norfolk-southern-shareholder-letter (https://perma.cc/V2HF-YPFA).

"environmental" "goal, factor, or investment principle," but it is hard to imagine that Strive will start telling its clients on September 1 that Strive "subordinates" shareholders' financial interests or that Texas will pursue enforcement action against it. It is proxy advisers like ISS that have drawn Texas's ire. S.B. 2337 thus impermissibly "furnishes a convenient tool for harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure." *Kolender v. Lawson*, 461 U.S. 352, 360 (1983) (citation and quotation marks omitted). And where "inherently vague statutory language permits such selective law enforcement, there is a denial of due process." *Smith v. Goguen*, 415 U.S. 566, 576 (1974).

### 3. S.B. 2337 chills protected speech.

S.B. 2337's vagueness "raises special First Amendment concerns because of its obvious chilling effect" on ISS' speech. *Fox Television Stations*, 567 U.S. at 254-255. That vagueness is "particularly troublesome given the penalties for failure to comply." *Ashcroft*, 745 F. Supp. 3d at 801. Any misstep on S.B. 2337's labyrinthian requirements "triggers extensive liability," including "significant civil penalties"[20] of $10,000 per violation, which could quickly add up to a staggering sum. *See* Tex. Bus. & Com. Code § 17.47(c)(1). "First Amendment freedoms need breathing space to survive," but S.B. 2337's "complicated and intricate scheme" backed by ruinous fines dissuades proxy advisers like ISS from speaking about Texas companies at all. *See Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 604 (1967). And that, after all, is the point: "to prevent" investment advice Texas does not like.[21]

## II.    The Remaining Factors Overwhelmingly Favor Preliminary Relief.

The remaining preliminary injunction factors underscore ISS' entitlement to relief. ISS

---

[20] H.R. Floor Action, at 9:40:03-9:40:21 (May 27, 2025) (Representative Goodwin).

[21] H.R. Floor Action, at 9:48:07-9:48:22 (May 27, 2025) (Representative Leach).

will suffer irreparable harm absent preliminary relief by September 1.  Subjecting ISS to S.B. 2337 means that ISS will be deprived of its First Amendment rights, which "unquestionably constitutes irreparable injury," *see Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024) (citation omitted), and ISS will be forced to navigate a vague legal regime backed by significant fines. Attempting to comply with S.B. 2337 would also impose "the irreparable harm of nonrecoverable compliance costs."  *See id.*; *see also* Kelly Decl. ¶¶ 43, 46, 48.  Compelling ISS to speak falsehoods against its own services would result in additional reputational damages and threaten ISS' business.  Kelly Decl. ¶¶ 45, 47-49.

The other factors—lack of harm to the opposing party and the public interest—also plainly favor ISS.  "[I]njunctions protecting First Amendment freedoms are always in the public interest," and "the State and the public won't be injured" by enjoining a law as applied to ISS that "likely violates the First Amendment."  *Book People*, 91 F.4th at 341 (citation omitted).  No harm will come to Texas's asserted interest in preventing fraud:  Like any other business, ISS remains subject to general prohibitions of fraud under both state and federal law.  Tex. Bus. & Com. Code § 17.46; 15 U.S.C. § 80b-6(2), (4).

## CONCLUSION

For the foregoing reasons, ISS respectfully requests an order enjoining Defendant Attorney General Paxton and his agents, employees, and all persons acting under his direction or control from taking any action to enforce S.B. 2337 against ISS, *see* S.B. 2337 § 6A.201, including but not limited to intervention in any private right of action, *see id.* § 6A.202(b).

20

Respectfully submitted,

/s/ Bruce D. Oakley

JESSICA L. ELLSWORTH*
  jessica.ellsworth@hoganlovells.com
DAVID M. FOSTER*
  david.foster@hoganlovells.com
JAMES YATES*
  james.yates@hoganlovells.com
SAM ZWINGLI*
  sam.zwingli@hoganlovells.com
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel: (202) 637-5600
Fax: (202) 637-5910

BRUCE D. OAKLEY (Texas Bar No. 15156900)
  bruce.oakley@hoganlovells.com
HOGAN LOVELLS US LLP
609 Main Street, Suite 4200
Houston, TX 77002
Tel: (713) 632-1420
Fax: (713) 632-1401

\* admitted pro hac vice

*Counsel for Plaintiff Institutional Shareholder Services Inc.*

Dated:  July 28, 2025