**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| INSTITUTIONAL SHAREHOLDER SERVICES INC., <br><br> *Plaintiff*, <br><br> v. <br><br> KEN PAXTON, in his official capacity as the Texas Attorney General, <br><br> *Defendant*. | No. 1:25-cv-01160-ADA |

**PLAINTIFF INSTITUTIONAL SHAREHOLDER SERVICES INC.'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ......................................................................................................................1

BACKGROUND ........................................................................................................................1

 A. ISS Advises Sophisticated Institutional Investors .......................................................1

 B. Texas Enacted SB 2337 To Target Proxy Advisors Like ISS ................................4

 C. ISS Sues Over SB 2337 And This Court Preliminarily Enjoins The Law..............7

STANDING ...............................................................................................................................7

ARGUMENT .............................................................................................................................8

I. SB 2337 Violates ISS' First Amendment Rights.........................................................8

 A. SB 2337 Compels ISS' Speech And Discriminates On Content And Viewpoint, Each Of Which Is Independently Unconstitutional .................................9

  1. SB 2337 Compels ISS To Make Statements Contrary To What ISS Believes.....9

  2. SB 2337 Discriminates Based On Content And Viewpoint ...............................11

 B. Paxton Cannot Prove SB 2337 Satisfies Any Level Of Scrutiny ............................12

  1. Texas's Shifting Anti-Fraud Interest Is Pretextual ......................................13

  2. SB 2337 Is Not Tailored To Texas's Supposed Anti-Fraud Interest...............19

  3. Paxton's Other Asserted Interests Are Illegitimate ....................................22

 C. Paxton Cannot Demonstrate That Any Exception To Strict Scrutiny Applies.........23

  1. Paxton Cannot Show SB 2337 Regulates Commercial Speech......................23

  2. Paxton Cannot Show That SB 2337 Satisfies *Zauderer* ................................25

II. SB 2337 Is Unconstitutionally Vague As Applied To ISS ................................................26

 A. SB 2337's Maze Of Requirements Leaves ISS Guessing How To Comply ............26

 B. Paxton Guarantees Arbitrary Enforcement...............................................................29

 C. The Resulting Uncertainty Chills ISS' Protected Speech.........................................29

III. ISS Is Entitled To A Permanent Injunction ...........................................................30

CONCLUSION...........................................................................................................................30

EXHIBITS

 1. Third Declaration of Lorraine Kelly (attaching First Declaration of Lorraine Kelly, ECF No. 14-1, and Second Declaration of Lorraine Kelly (ECF No. 28-1))

 2. Declaration of Dana A. Raphael and Exhibits 1-48 (ECF Nos. 42-2, 42-3)

 3. Declaration of Bruce D. Oakley and Exhibits 1-68

**TABLE OF AUTHORITIES**

Page(s)

CASES:

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023)...................................................................................9, 10, 13

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
492 U.S. 469 (1989)...................................................................................23

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983)...................................................................................24

*Book People, Inc. v. Wong*,
692 F. Supp. 3d 660 (W.D. Tex. 2023)...................................................11, 13, 28

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) ...................................................................11, 23-25

*Book People, Inc. v. Wong*,
__ F. Supp. 3d __, 2025 WL 3035109 (W.D. Tex. Oct. 21, 2025)...................11, 26, 27, 29, 30

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011)...................................................................................14, 19, 20, 21

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...................................................................................15

*Edenfield v. Lane*,
507 U.S. 761 (1993)...................................................................................13

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)...................................................................................26, 29

*Free Speech Coal., Inc. v. Paxton*,
95 F.4th 263 (5th Cir. 2024) ...................................................................14, 19, 22, 25

*Harris v. Quinn*,
573 U.S. 616 (2014)...................................................................................24

*Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*,
538 U.S. 600 (2003)...................................................................................19

*ISS v. SEC*,
718 F. Supp. 3d 7 (D.D.C. 2024) ...........................................................2, 14

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
585 U.S. 878 (2018)..................................................................................25

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
385 U.S. 589 (1967)..................................................................................30

*Kolender v. Lawson*,
461 U.S. 352 (1983)..................................................................................29

*Lane v. Franks*,
573 U.S. 228 (2014)....................................................................................8

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)..................................................................................22

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022)......................................................................................23

*NAACP v. DOE*,
779 F. Supp. 3d 53 (D.D.C. 2025).............................................................29

*Nat'l Ass'n of Mfrs. v. SEC*,
748 F.3d 359 (D.C. Cir. 2014)...................................................................24

*Nat'l Educ. Ass'n-N.H. v. NH Attorney Gen.*,
__ F. Supp. 3d __, 2025 WL 2807652 (D.N.H. Oct. 2, 2025)................28

*NIFLA v. Becerra*,
585 U.S. 755 (2018).............................................9, 11, 13-15, 19- 21, 24-26

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)........................................................................12, 13, 21

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988)........................................................................19, 22, 24

*Robledo v. Yardi Sys., Inc.*,
741 F. Supp. 3d 617 (W.D. Tex. 2024).....................................................15

*Rosenberger v. Rector & Visitors of UVA*,
515 U.S. 819 (1995)..................................................................................12

*Sec. Indus. & Fin. Markets Ass'n v. Ashcroft*,
745 F. Supp. 3d 783 (W.D. Mo. 2024) ................................................27, 29

Page(s)

*Smith v. Goguen*,
415 U.S. 566 (1974)............................................................................................29

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)............................................................................12, 13, 22

*Stock v. Gray*,
773 F. Supp. 3d 733 (W.D. Mo. 2025) ..............................................................18

*Students Engaged in Advancing Tex. v. Paxton*,
765 F. Supp. 3d 575 (W.D. Tex. 2025)......................................................27, 29

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)............................................................................................14

*Women's Med. Ctr. of Nw. Houston v. Bell*,
248 F.3d 411 (5th Cir. 2001) .............................................................................29

*X Corp. v. Bonta*,
116 F.4th 888 (9th Cir. 2024) .....................................................................11, 24

*Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*,
471 U.S. 626 (1985)......................................................................................23, 25

**STATUTES:**

15 U.S.C. § 80b-6(2)...........................................................................................14

15 U.S.C. § 80b-6(4)...........................................................................................14

Cal. Gov't Code § 7510.5 ...................................................................................10

Texas SB 2337

§ 1(1)................................................................................13, 20

§ 1(2)(B)....................................................................................17

§ 1(4)........................................................................................13

§ 6A.001(1)...................................................................................5

§ 6A.001(3).................................................................................12

§ 6A.001(4)..............................................................................5, 27

§ 6A.001(4)(B)............................................................................27

§ 6A.001(4)(C).......................................................................26, 27

§ 6A.001(4)(D)............................................................................27

§ 6A.001(5).................................................................................28

§ 6A.101(a)..............................................................................5, 27

§ 6A.101(a)(1).....................................................................5, 12, 27

§ 6A.101(a)(1)(A)-(D)....................................................................5

§ 6A.101(a)(2)(A)..........................................................................5

§ 6A.101(a)(2)...........................................................5, 12, 26, 28

§ 6A.101(a)(3).....................................................................12, 27, 28

§ 6A.101(a)(4)...........................................................5, 12, 26, 28

§ 6A.101(b)............................................................................27, 28

§ 6A.101(b)(1)(A)...................................................................6, 9, 28

§ 6A.101(b)(1)(B)...................................................................6, 9, 27

§ 6A.101(b)(2).................................................................................9

§ 6A.101(b)(3)...................................................................6, 9, 28

§ 6A.101(c).................................................................................28

§ 6A.102(a)..............................................................................6, 28

§ 6A.102(a)(1)............................................................................28

§ 6A.102(a)(2)............................................................................28

§ 6A.102(a)(3)..................................................................12, 26, 28

§ 6A.102(b)...........................................................................6, 9, 28

§ 6A.102(b)(2)................................................................................6

§ 6A.102(b)(3)..........................................................................6, 11

§ 6A.201...................................................................................6, 30

§ 6A.202(b).................................................................................30

Tex. Bus. & Com. Code § 17.46.....................................................14

Tex. Bus. & Com. Code § 17.47(c)(1)...........................................6, 29

**RULE:**

Fed. R. Civ. P. 56(a) .........................................................................8

Page(s)

**REGULATIONS:**

17 C.F.R. § 240.14a–4(c) ................................................................................28

17 C.F.R. § 240.14a–8(c) ..................................................................................2

17 C.F.R. § 240.14a–8 ......................................................................................2

57 Fed. Reg. 48,276 (Oct. 22, 1992) ..................................................10, 14, 25

87 Fed. Reg. 73,822 (Dec. 1, 2022) ................................................................10

89 Fed. Reg. 21,668 (Mar. 28, 2024) ..............................................................10

**INTRODUCTION**

Plaintiff Institutional Shareholder Services Inc. ("ISS") moves for summary judgment against Defendant Attorney General Paxton and Defendants-Intervenors the Texas Stock Exchange ("TXSE") and the Texas Association of Business ("TAB") (collectively, "Defendants"). There is no genuine dispute that SB 2337 is unconstitutional as to ISS. The law forces ISS to make false statements the company would never otherwise make, and it is motivated by rank viewpoint discrimination: The Texas Legislature does not like ISS' speech and thus seeks to change it. This is an affront not just to the First Amendment, but also to the free-market system in which ISS plays a valued, market-driven role. On top of that, the law is so vague that it permits, and even encourages, arbitrary enforcement in violation of ISS' due process rights.

SB 2337 is predicated on a supposed need to protect Texas institutional investors from "fraud." But the Texas Legislature had no evidence of fraud. Paxton has no evidence, either: When asked to identify any examples, Paxton responded with a hunch: Paxton "*believes generally that ISS has made false or misleading statements.*" As for Intervenors, they rest on the "evidence" they submitted at the preliminary-injunction stage—a smattering of public documents that was not enough to avert this Court's entry of an injunction, and is certainly not enough to create a genuine dispute now. This makes plain that Defendants' "fraud" theory was a mere pretext and cannot justify the broad prophylactic burdens that SB 2337 imposes on ISS' speech as a matter of law.

There is no set of facts under which Defendants can win this case, much less a genuine dispute of material fact that would warrant a trial. This Court should enter summary judgment for ISS, declare SB 2337 unconstitutional as applied to ISS, and permanently enjoin Paxton from enforcing SB 2337 against ISS.

1

# BACKGROUND

## A.     ISS Advises Sophisticated Institutional Investors.

Public companies hold annual and special meetings to conduct business that requires shareholder approval.  Matters requiring shareholder votes at upcoming meetings are compiled into a "proxy statement"; at these meetings, investors' proxies—designees who vote the shares owned by particular stockholders—vote on the issues listed in the proxy statement.  *See generally* Ex. 25 at 4.  Proxy statements include votes on a variety of issues, including routine and high-profile matters like electing directors, executive compensation, and mergers and acquisitions.  *See ISS v. SEC*, 718 F. Supp. 3d 7, 11 (D.D.C. 2024), *aff'd*, 142 F.4th 757 (D.C. Cir. 2025).  Federal law requires public companies to hold advisory shareholder "say on pay" votes on the compensation of top executives and on qualifying proposals by shareholders.  *See* 17 C.F.R. § 240.14a–8; Ex. 61 at 49.  Shareholder proposals are typically nonbinding and the company can offer its "own point of view" on the proposal and urge shareholders to vote against it.  17 C.F.R. § 240.14a–8.  Shareholders can also directly submit proposals for consideration at shareholder meetings, which may depend on the company's bylaws.  *Id.* § 240.14a–4(c).

Institutional investors—sophisticated market participants that, in some cases, manage billions or even trillions of dollars for thousands of investors across numerous companies—field thousands of shareholder votes each year.  Historically, these investors often followed the so-called Wall Street Rule ("vote with management or sell") because it was too expensive and time-consuming to inform themselves about thousands of shareholder votes across all the companies in their investment portfolios.  *See* ECF No. 42-3 pdf.9-10 [Ex. 25].

The entry of proxy advisors like ISS—which provide research and recommendations about proxy voting proposals—helped institutional investors break from this default and make informed

decisions about how to vote in line with their own preferences. *See ISS*, 142 F.4th at 761. ISS is registered with the SEC under the Investment Advisers Act. First Kelly Decl. ¶ 4. But ISS is not akin to a personal investment advisor; "ISS does not manage investment accounts or make buy, sell or hold investment recommendations to clients." ECF No. 42-2 pdf.150 [Ex. 15]. Instead, ISS offers research and recommendations, based on a client's chosen framework, about how clients should vote their shares in their existing portfolios in shareholder elections. First Kelly Decl. ¶¶ 5-6. Clients, in turn, "must determine whether and how to incorporate [ISS'] research . . . into their investment decision-making process." ECF No. 42-2 pdf.144 [Ex. 15].

To meet clients' diverse needs, ISS offers three types of frameworks that guide its recommendations: (1) the Benchmark Policy, which is a detailed framework for advice on particular issues; (2) client-specific Custom Policies reflecting clients' specific approaches to voting; and (3) Specialty Policies, which evaluate governance issues from thematic perspectives, such as faith-based or sustainable investing. First Kelly Decl. ¶¶ 21-33; *cf.* ECF No. 42-3 pdf.91 [Ex. 26] ("ISS . . . bases its recommendations on factors that shareholders consider important.").

For upcoming shareholder votes, ISS reviews each proposal on the proxy statement, researches relevant information and data, and analyzes the proposal and data through the prism of the client's chosen policy framework(s) to come up with a voting recommendation on each proposal. First Kelly Decl. ¶¶ 17-20, 34-37. ISS routinely offers different recommendations about the same vote to different clients, depending on the client's chosen voting policy. *Id.* ¶¶ 20, 24. ISS has no financial interest in the outcome of a shareholder vote and is disinterested as to whether its clients ultimately support a proposal, reject a proposal, or abstain from voting altogether. *Id.* ¶ 36. And ISS clients "often ignore its advice, especially the larger institutions and especially on higher profile issues." ECF No. 42-3 pdf.47 [Ex. 25]; *see* First Kelly Decl. ¶ 19.

3

There is a strong market demand for ISS' services. In 2024, ISS assisted approximately 2,000 clients in connection with voting analyses and recommendations for 51,500 shareholder meetings in approximately 100 developed and emerging markets worldwide. First Kelly Decl. ¶ 15.[1] ISS' clients include the Teacher Retirement System of Texas (TRS) and the Employees Retirement System of Texas (ERS), which manage funds for retired Texas public-school teachers and Texas state employees, and the Texas Permanent School Fund Corporation (TPSFC), which manages a fund to support Texas's public schools. Ex. 2 (10/17/2024 Tr. 65, 70, 129). TRS testified to the Texas Senate that ISS' Board Aligned Specialty Policy has "worked very well for" them. Ex. 2 (10/17/2024 Tr. 65, 80-81). ERS testified that the custom policy ISS administers for ERS is "best in class at this point." Ex. 2 (10/17/2024 Tr. 92). And TPSFC expressed its satisfaction with the "ESG skeptic" Custom Policy ISS administers and a "high level of confidence that this expression of our policy and our values is being administered correctly." Ex. 2 (10/17/2024 Tr. 129-130); *see* ECF No. 42-3 pdf.139-141 [Ex. 34].

B.      **Texas Enacted SB 2337 To Target Proxy Advisors Like ISS.**

SB 2337 targets ISS as one of the "two largest proxy advisory firms," ECF No. 42-2 pdf.95 [Ex. 6], which the Texas Legislature believes hold "outsized influence" in the free market, Ex. 4 (4/24/2025 Tr. 54); *see* Ex. 9 at 32-41. The bill's sponsors lamented that ISS has at times recommended investors support proposals by so-called "activist shareholders . . . that are opposed by the management of the company," Ex. 6 (5/8/2025 Tr. 26) (Sen. Hughes), and that ISS provides advice on "political hot-button issues," including "environmental, social, and governance" and "DEI factors," Ex. 3 (4/23/2025 Tr. 5) (Rep. Leach). According to the Texas Legislature, when

---

[1] ISS also offers a suite of other services, including risk assessment tools, company scoring, and thought leadership, some of which may be provided in connection with a proxy vote but that are otherwise freestanding services. First Kelly Decl. ¶¶ 38-42; Second Kelly Decl. ¶¶ 4-5.

ISS considers factors such as "ESG" or "anything political or partisan," "that's what we want to prevent. That's what we want to avoid." Ex. 7 (5/27/2025 Tr. 22).

SB 2337 seeks to accomplish that goal by imposing onerous requirements on proxy advisors that provide certain recommendations to their clients regarding Texas companies—companies that are incorporated or headquartered in Texas, or have proposed to become a Texas company. SB 2337 § 6A.001(1). The law has two primary components: Section 6A.101, which mandates warnings for so-called "nonfinancial" advice, and Section 6A.102, which mandates warnings for so-called "materially different" advice.

***Mandated Warnings For "Nonfinancial" Advice.*** Section 6A.101 applies when advisors provide "proxy advisory service[s]" that the law defines as "not provided solely in the financial interest of the shareholders." *Id*. § 6A.101(a). A service—broadly defined as, among other things, "advice or a recommendation on how to vote," "proxy statement research and analysis," and a "rating or research regarding corporate governance," *id.* § 6A.001(4)—is "not provided solely in the financial interest of the shareholders" if any of the following conditions applies:

- The service is "wholly or partly based on, or otherwise takes into account," any "nonfinancial factors," *id.* § 6A.101(a)(1); *see id.* § 6A.101(a)(3), which include without limitation the following examples, none of which is defined: (1) "an environmental, social, or governance (ESG) goal, factor, or investment principle"; (2) "diversity, equity, or inclusion (DEI)"; (3) "a social credit or sustainability factor or score"; or (4) "membership in or commitment to an organization or group that wholly or partly bases its evaluation or assessment of a company's value over any period on nonfinancial factors." *Id*. § 6A.101(a)(1)(A)-(D).

- The proxy advisor "advises against" a company's proposal to elect a governing person. *Id*. § 6A.101(a)(4).

- The proxy advisor recommends action on a shareholder-sponsored proposal "inconsistent" with the company board's recommendation. *Id.* § 6A.101(a)(2).

Advisors whose services include these criteria are compelled to issue a series of warnings. As to the clients and the Texas company, the proxy advisor must (1) "conspicuously state[] that

5

the service is not being provided solely in the financial interest of the [Texas] company's shareholders because it is based wholly or partly on one or more nonfinancial factors"; and (2) explain "with particularity" the basis of the advice and that "the advice *subordinates the financial interests of shareholders* to other objectives, including *sacrificing investment returns* or undertaking additional investment risk to promote one or more nonfinancial factors." *Id.* § 6A.101(b)(1), (2) (emphases added). The advisor must also "publicly and conspicuously disclose" on its website homepage that its services "include advice and recommendations that are not based solely on the financial interest of shareholders." *Id.* § 6A.101(b)(3).

***Mandated Warnings For "Materially Different" Advice.*** Section 6A.102 imposes additional burdens if a proxy advisor gives "materially different" advice. *Id.* § 6A.102(b). Advice is "materially different" if a proxy advisor "simultaneously" advises that (1) different clients "vote for" and "vote against" a proposal; (2) different clients "vote for" and "vote against or abstain from voting" for a nominee for a Texas company's management; or (3) any client "vote[s] for or against" a proposal "in opposition" to the Texas company's recommendation. *Id.* § 6A.102(a).

Unless clients have "expressly requested services for a nonfinancial purpose," the proxy advisor must notify (1) "each shareholder receiving the advice"; (2) anyone "receiving the advice or recommendation on behalf of a shareholder"; (3) the Texas company that is the subject of the advice; and (4) the Texas Attorney General. *Id.* § 6A.102(b)(2). To each of those entities, the proxy advisor must identify which of the so-called "conflicting" recommendations is "provided solely in the financial interest of shareholders," and which is "supported by any specific financial analysis performed or relied on by" the proxy advisor. *Id.* § 6A.102(b)(3).

***Penalties.*** The penalties for noncompliance with the law's byzantine (and vague) requirements are severe: A proxy advisor that fails to comply with SB 2337 is deemed to have

committed a "deceptive trade practice," actionable by the Texas Attorney General, with civil penalties of $10,000 per violation. *Id.* § 6A.201; Tex. Bus. & Com. Code § 17.47(c)(1).

### C. ISS Sues Over SB 2337 And This Court Preliminarily Enjoins The Law.

ISS challenged the law as unconstitutional as applied to ISS and moved for a preliminary injunction, which this Court granted after a hearing. *See* ECF Nos. 1, 14, 44, 47, 48; 8/29/2025 Text Order. Paxton and Intervenors elected not to pursue appeals to the PI. *See* ECF No. 72. This Court set the case for trial on February 2, 2026. 8/29/2025 Text Order.

The parties agreed to and the Court approved a joint scheduling order with expedited deadlines. ECF Nos. 49, 50. Defendants have, at every turn, taken unnecessary positions that have jeopardized the schedule. They refused to agree to this Court's standard two-tiered protective order, which delayed entry of that order, ECF No. 66, and ISS' document productions by roughly two months. Nonetheless, ISS has provided over 16,000 documents. Defendants routinely ignored or missed deadlines, ECF No. 69 at 3, and Intervenors resisted almost all discovery, refusing to provide any information about TAB's members or TXSE's future listees—despite Intervenors' claims in their intervention papers that their constituents are "harmed." ECF 30 at 5; *see* ECF No. 64 at 1-4. Nor have Defendants identified any specific statements by ISS they claim are false or misleading. Two days before the end of fact discovery, Paxton and Intervenors moved to modify the case schedule and to consolidate this case with two other cases, ECF No. 68, and this Court rescheduled its hearing on that motion to December 19. *See* ECF No. 74.

### STANDING

ISS has standing, as the Court found at the PI stage.[2] ECF No. 44 at 4 (PI Hr'g Tr.). ISS

---

[2] Paxton also correctly "concede[d]" that sovereign immunity does not apply, PI Hr'g Tr. 13-14, and offered no rebuttal to ISS' argument that this challenge is ripe, *see* ECF No. 28 at 5-6.

would suffer economic, reputational, and constitutional harms if Paxton could enforce SB 2337, and those harms would be redressed by an injunction barring enforcement.  First Kelly Decl. ¶¶ 43, 45(c), 46-49; Second Kelly Decl. ¶¶ 3-5; Third Kelly Decl. ¶¶ 3-9; ECF No. 28 at 1-5.  ISS faces a credible threat of enforcement, *see* ECF No. 28 at 4-7; ECF No. 42-3 pdf.193-221 [Exs. 43-47]; Exs. 23, 24, as Paxton has repeatedly underscored:  Paxton issued a press release promising to "aggressively" defend SB 2337, ECF No. 42-3 pdf.194 [Ex. 43], on the same day that he sent ISS a Civil Investigative Demand seeking information related to SB 2337, including examples of ISS' "explanations about the opportunity cost to ESG-oriented decisions."  Ex. 21 at 6; *see* Ex. 22.

## ARGUMENT

SB 2337 is unconstitutional as applied to ISS, as the Court found at the PI stage.  Because there are no genuine disputes of material fact, ISS is now entitled to judgment as a matter of law and a permanent injunction.  Fed. R. Civ. P. 56(a).

## I.      SB 2337 Violates ISS' First Amendment Rights.

When ISS provides advice on issues running the gamut from executive compensation packages to disclosures of climate-related risks, ISS is speaking "on matters of public concern . . . at the heart of the First Amendment," which protects the "unfettered interchange of ideas."  *Lane v. Franks*, 573 U.S. 228, 235-236 (2014) (citation and quotation marks omitted).  Paxton agrees these topics are core speech; as he stated in another case, "speech about climate change . . . is exactly the type of speech the First Amendment protects."  State of Texas Amicus Br., *Exxon Mobil Corp. v. Healey*, No. 18-1170, 2018 WL 5298251, at *6 (2nd Cir. Oct. 23, 2018).

SB 2337 is unconstitutional as applied to ISS for two independent reasons:  (1) it compels ISS' speech; and (2) it discriminates on content and viewpoint.  Both flaws demand strict scrutiny—but even if the Court applied a lower standard of review, SB 2337 could not survive

summary judgment: There is no genuine dispute that SB 2337's burdens cannot be justified by the pretextual rationales offered by Defendants.

**A.      SB 2337 Compels ISS' Speech And Discriminates On Content And Viewpoint, Each Of Which Is Independently Unconstitutional.**

**1.    SB 2337 Compels ISS To Make Statements Contrary To What ISS Believes.**

"[I]f there is any fixed star in our constitutional constellation, it is the principle that the government may not interfere with an uninhibited marketplace of ideas." *303 Creative LLC v. Elenis*, 600 U.S. 570, 584-585 (2023) (citations and quotation marks omitted). That means "no government may affect a speaker's own message by forcing [it] to accommodate views [it] does not hold." *Id.* at 599-600 (cleaned up).

SB 2337 violates that core principle as a matter of law. When ISS recommends voting against an executive pay package,[3] recommends voting against directors given their management of climate-related issues, or recommends voting for a shareholder proposal requesting a report on reduced plastics demand,[4] for example, SB 2337 would force ISS to denigrate the opinions expressed in its speech as "subordinat[ing] the financial interests of shareholders." SB 2337 § 6A.101(b)(1)(B); *id.* §§ 6A.101(b)(1)(A), (2), (3), 6A.102(b). Requiring ISS to repudiate its message, including on "political hot-button issues,"[5] "plainly alters the content" of ISS' speech and is "presumptively unconstitutional." *NIFLA v. Becerra*, 585 U.S. 755, 766 (2018) (cleaned up).

Forcing ISS to label its speech as "nonfinancial" and "conflicting" also requires ISS to

---

[3] Ex. 64 at 1, 14-39 (Benchmark Policy Recs., 11/6/2025 Tesla, Inc. meeting).

[4] Ex. 66 at 2-3, 18, 57 (Climate Specialty Policy Recs., 5/31/2023 Exxon Mobil Corp. meeting).

[5] Ex. 3 (4/23/2025 Tr. 5) (Rep. Leach); *see also* Ex. 4 (4/24/2025 Tr. 55) (Sen. Hughes) (complaining about proxy advice in "area where tremendous policy decisions are being made" "on so many issues that affect our daily lives").

advance state-mandated views with which ISS disagrees.[6]  The SEC has long recognized that proxy advice is "by its nature judgmental" and a matter of "opinion[ ]" for which there "is not a 'correct' viewpoint." 57 Fed. Reg. 48,276, 48,278 (Oct. 22, 1992).  Indeed, these issues are highly disputed.  Texas may disfavor governance, social, and environmental considerations in proxy advice.  Other States, however, have expressed the view that factors like "climate-related financial risk," Cal. Gov't Code § 7510.5, can be material and "beneficial to investment analysis and decision making,"[7] as have major asset managers, institutional investors, and public commentators.[8]  So has the federal government.[9]  And so do Texas public companies.[10]  Even Intervenor TAB recognizes that "anti-ESG" laws have financial relevance:  "[W]hen government attempts to mandate values (no matter what kind) to business, the market loses, and taxpayers bear the consequence."  ECF No. 42-2 pdf.82 [Ex. 5].  By requiring ISS to label its advice "nonfinancial" and "conflicting," SB 2337 declares ISS' advice on issues like "climate change to be 'deceiving' or incorrect," which Paxton admits is "textbook viewpoint discrimination" for other speakers.

---

[6] Apparently SB 2337's sponsor doesn't share that view, either:  He lauds the "ESG skeptic" Custom Policy that ISS administers as "the best" and "believe[s] every fund, ought to use" it. Ex. 2 (10/17/2024 Tr. 129-130) (Sen. Hughes).  Yet SB 2337 would force ISS to say its advice under that policy "subordinates" shareholders' financial interests, too.  *See* ECF No. 23-1 at 7.

[7] Ex. 39 at 9 (Investment Policy Manual, Maryland State Retirement and Pension System); *see also* Exs. 33-50 (proxy voting policies of 17 other state and local entities that consider ESG factors).

[8] *E.g.*, Ex. 55 at 1 (Goldman Sachs) ("We recognize that Environmental, Social and Governance (ESG) factors can affect investment performance, [and] expose potential investment risks."); Exs. 51-54 (similar policies of four other asset managers); Ex. 28 at 4 (Council of Institutional Investors) ("ESG considerations are often relevant to the financial performance on an investment"); Exs. 26, 27 (similar); Ex. 17 (Evans Rep. ¶ 34); ECF No. 42-2 pdf.72-73 [Ex. 4]; ECF No. 42-3 pdf.109-116, 120-125, 162, 232 [Exs. 28-29, 31, 37, 48].

[9] 87 Fed. Reg. 73,822, 73,824 (Dec. 1, 2022) ("there could be instances when ESG issues present material business risk or opportunities"); 89 Fed. Reg. 21,668, 21,671-72 (Mar. 28, 2024) ("climate-related risks can affect a company's business and . . . financial performance").

[10] *E.g.*, Ex. 56 at 3 (Exxon Mobil Corp. Letter, Jan. 2025) ("2050 net zero ambition"); Ex. 57 at 8 (Valero Energy Corp. Letter, Jan. 2024) ("Valero's low-carbon strategy is its business strategy").

Texas Amicus Br., 2018 WL 5298251, at *10 (brackets omitted).  That is no less true for ISS.

SB 2337 would also force ISS "to create speech on weighty issues with which [ISS] disagrees" and then disseminate that speech to an audience ISS has not chosen.  *303 Creative*, 600 U.S. at 599.  Under Texas's law, ISS must "*explain[ ] with particularity*" how its advice "subordinates" shareholders' "financial interests," even if ISS entirely disagrees with that description.  SB 2337 § 6A.101(b)(1)(B) (emphasis added); *see id.* §§ 6A.101(b)(1)(A), (2), (3), 6A.102(b).  Texas's law also requires ISS to weigh and label "which" of its differing recommendations to different clients is "solely" in shareholders' "financial interest" and which is not, *see id.* § 6A.102(b)(3)—an inherently fraught comparative analysis again requiring ISS to assert positions ISS does not believe.  Third Kelly Decl. ¶ 7; *see Book People, Inc. v. Wong*, No. 1:23-CV-00858, __ F. Supp. 3d __, 2025 WL 3035109, at *6 (W.D. Tex. Oct. 21, 2025) ("*Book People III*") ("compelling Plaintiffs to make controversial statements against their will" is unconstitutional); *X Corp. v. Bonta*, 116 F.4th 888, 901-902 (9th Cir. 2024) (similar).  SB 2337 would then force ISS to widely disseminate this speech not only to clients but also to the boards of Texas companies, retail investors, and the Texas Attorney General—audiences ISS would not otherwise engage.  ISS has the right to speak only to its chosen audience—those institutional-investor clients who have hired ISS—and to "not provide public assessments" to others.  *Book People, Inc. v. Wong*, 692 F. Supp. 3d 660, 690 (W.D. Tex. 2023) ("*Book People I*"), *aff'd in part, vacated in part on other grounds*, 91 F.4th 318 (5th Cir. 2024) ("*Book People II*").

### 2.  SB 2337 Discriminates Based On Content And Viewpoint.

Aside from compelled speech, SB 2337 is independently unconstitutional because content and "viewpoint discrimination [are] inherent in the design and structure" of the law.  *NIFLA*, 585 U.S. at 779 (Kennedy, J., joined by Roberts, C.J., and Alito and Gorsuch, JJ., concurring).

Content and viewpoint discrimination are obvious on the face of SB 2337.  "The burdens

11

created by Senate Bill 2337 are extensive," requiring an enormous volume of mandated warnings, "backed by onerous legal liability." Ex. 7 (5/27/2025 Tr. 15) (Rep. Goodwin); *see* First Kelly Decl. ¶ 46; Second Kelly Decl. ¶ 3; Third Kelly Decl. ¶ 9. But the law imposes those burdens selectively "based on the content of speech and the identity of the speaker." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). Indeed, that is the very purpose of the statute.

SB 2337 is "aimed at particular speakers." *Id.* It burdens the advice of proxy advisors like ISS that advise shareholders "for compensation," SB 2337 § 6A.001(3), while exempting those that advise Texas investors for free; the company issuers[11] or shareholders that are the proponents of particular proposals; and the entities that lobby Texas investors for votes. SB 2337 also singles out speech on certain topics for regulation—such as governance or environmental factors—while exempting speech on other topics. *Id.* § 6A.101(a)(1), (3). And the law explicitly favors certain viewpoints over others: SB 2337 favors pro-corporate management speech by burdening advice to vote against or even inconsistently with the views of Texas companies, while exempting advice to adopt the board's view from those same burdens. *See id.* §§ 6A.101(a)(2), (4), 6A.102(a)(3); ECF No. 42-3 pdf.128 [Ex. 32]. SB 2337 also favors Texas's view of what is a "nonfinancial" factor by burdening speakers like ISS that disagree with Texas's assessment.

SB 2337 thus on its face "imposes financial burdens on certain speakers based on the content of their expression"—and because the law also selectively burdens "particular views," the First Amendment violation "is all the more blatant." *Rosenberger v. Rector & Visitors of UVA*, 515 U.S. 819, 828-829 (1995). Even SB 2337's sponsors made crystal clear that they targeted proxy advisors—and ISS specifically—because of their perceived views. *Supra*, pp. 4-5; *see also*

---

[11] *Cf.* Ex. 58 at 2 (ExxonMobil program for shareholders authorizing ExxonMobil to "vote their shares based on the recommendation of the Company's Board" in perpetuity).

Ex. 4 (4/24/2025 Tr. 53-54) (Sen. Hughes) ("[S]adly, in recent years, proxy advisory firms have become increasingly political," and "the two primary proxy advisory firms" are "basing their advice on ESG standards"). Even facially neutral laws—which SB 2337 is not—must satisfy strict scrutiny if adopted "because of disagreement with the message the speech conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (citation and brackets omitted).

### B. Paxton Cannot Prove SB 2337 Satisfies Any Level Of Scrutiny.

Compelled speech is anathema to the First Amendment; courts thus regularly reject compelled-speech laws without considering whether they could survive strict scrutiny. *See, e.g.*, *303 Creative*, 600 U.S. at 603; *Book People I*, 692 F. Supp. 3d at 688-692. It is similarly "all but dispositive to conclude that a law is content based and, in practice, viewpoint discriminatory." *Sorrell*, 564 U.S. at 57. But strict scrutiny applies at a minimum—as even Intervenors agree. ECF No. 46 at 12; *see* PI Hr'g Tr. 66-67. And as foreshadowed by Paxton's failure to mount any defense at the PI stage under this standard, as a matter of law, SB 2337 is not "narrowly tailored to serve compelling state interests." *NIFLA*, 585 U.S. at 766 (quoting *Reed*, 576 U.S. at 163).

Nor can Paxton avoid summary judgment by invoking a commercial-speech exception to strict scrutiny under *Central Hudson* or *Zauderer*. As a matter of law, no exception applies: SB 2337 compels far more than commercial speech—and even if it could be characterized as commercial, SB 2337 mandates speech that is not "purely factual and uncontroversial." *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985). Paxton lacks evidence establishing a triable issue of fact on these issues. *Edenfield v. Lane*, 507 U.S. 761, 770 (1993) ("party seeking to uphold a restriction on commercial speech carries the burden of justifying it") (citation omitted). Ultimately, however, the level of scrutiny afforded cannot change the result: Because the Texas Legislature lacked *any* non-pretextual interest, and the law is not remotely tailored to a legitimate concern, "the outcome is the same whether a special commercial

13

speech inquiry or a stricter form of judicial scrutiny is applied." *Sorrell*, 564 U.S. at 571.

### 1. Texas's Shifting Anti-Fraud Interest Is Pretextual.

SB 2337's legislative findings assert the law is "necessary" to protect "shareholders in this state [that] hire" proxy advisors from "fraudulent or deceptive acts and practices in [Texas]." SB 2337 § 1(1), (4). The undisputed facts make clear that this is wrong top to bottom.

For one thing, there can be no genuine dispute that ISS' clients—sophisticated institutional investors—are *not* in need of protection. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (under strict scrutiny, "[t]he State must specifically identify an 'actual problem' in need of solving") (citation omitted); *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 283 (5th Cir. 2024) (under intermediate scrutiny, government interest must be "substantial"); *NIFLA*, 585 U.S. at 776-777 (under *Zauderer*, harm may not be "purely hypothetical") (citation omitted). As this Court recognized, "[t]hese are sophisticated investors" who have "hired [ISS] to provide the information"—"[h]ow is it fraud for [ISS] to be providing these customers the information that they have sought?" PI Hr'g Tr. 98-99. Answer: It isn't. Institutional investors are perfectly capable of reviewing proxy materials, the views of company issuers and shareholder proponents, proxy solicitations, and any analyses and voting recommendations from ISS, and making their own decisions about how to vote.

The bill history reflects that. As one state senator aptly put it, these are "sophisticated, institutional shareholder investors that don't really need the State of Texas and the Attorney General babysitting them." Ex. 6 (5/8/2025 Tr. 24) (Sen. Eckhardt). Federal and state law already protect investors from deception.[12] And a supposed interest in protecting proxy advisors' clients

---

[12] *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 768 (1976) (proffered interest is "greatly undermined" if already addressed); *NIFLA*, 585 U.S. at 777 (same). ISS is comprehensively regulated under the federal Investment Advisers Act of 1940, as amended,

is hard to square with statements of SB 2337's sponsor, who derided certain investors as "like Al Capone and his guys in Chicago." Ex. 2 (10/17/2024 Tr. 49) (Sen. Hughes); *see* Ex. 4 (4/24/2025 Tr. 75-76). States generally do not enact laws to protect mobsters; protecting institutional investors clearly was not SB 2337's genuine goal.

Defendants have also offered shifting explanations of what exactly is the "fraud" SB 2337 targets. No matter the theory, though, Defendants have absolutely no competent evidence to support it. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (summary judgment is appropriate if "there is an absence of evidence to support the nonmoving party's case"). They instead offer a mishmash of "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation"—none of which is "competent summary-judgment evidence." *Robledo v. Yardi Sys., Inc.*, 741 F. Supp. 3d 617, 621 (W.D. Tex. 2024) (Albright, J).

Paxton's concern that investors are not "fully informed as to potential conflicts and the economic rationale behind the advice they receive," ECF No. 23-1 at 25, is "purely hypothetical"; Paxton "points to nothing suggesting" ISS' clients "do not already know" how ISS develops its recommendations. *NIFLA*, 585 U.S. at 776-777. The record shows they do. ISS offers public, detailed explanations about its methodologies under its Benchmark and seven Specialty Policies. First Kelly Decl. ¶¶ 28-33; *see* ECF No. 42-2 pdf.97-323 [Exs. 7-23]. As for Custom Policies, ISS' clients have the opportunity to *design* those policies and thus know exactly what they are asking ISS to consider. First Kelly Decl. ¶¶ 22-25. In advance of a shareholder vote, clients receive a report and recommendation for each Policy to which they subscribe. *Id.* ¶ 35. And

---

and a "proxy advisory firm that deceives a client or fails to act in a client's interests" is subject to federal and state prohibitions on fraud, plus state tort liability. *See ISS*, 718 F. Supp. 3d at 27; *see also* 15 U.S.C. § 80b-6(2), (4); 57 Fed. Reg. at 48,278-79 (SEC's conclusion that existing rules "provide adequate protection against fraudulent and deceptive communications to shareholders"); Tex. Bus. & Com. Code § 17.46 (state ban on "[f]alse, misleading, or deceptive acts or practices").

clients subscribing to Custom and Specialty Policies also receive a copy of ISS' recommendation under the Benchmark Policy—so clients *know* ISS issues different recommendations.[13]  *Id.*

Paxton has also suggested that ISS makes misleading statements.  *See* ECF No. 24-1 at 27. But when asked to identify any examples, Paxton responded only that he "believes generally that ISS has made false or misleading statements that its voting recommendations are being made solely in the financial interests of its customers and/or the companies affected by those recommendations."  Ex. 12 at 4 (Paxton 1st ROGs).  And when asked to identify "all current or former personnel of the State of Texas, . . . with knowledge of any false or misleading statements" by ISS, Paxton responded there are "no such individuals other than counsel."  *Id*. at 7.  Needless to say, a personal hunch held by counsel is not competent evidence of fraud.

Intervenors, for their part, claim the "relevant falsehood" is that ISS says (according to Intervenors) that its "recommendations are based on impartial financial analysis."  ECF No. 46 at 14.  Yet Defendants have nothing to back that up.  When pressed for evidence, Intervenors gestured back at the documents "attached as exhibits" to their PI brief.  Ex. 10 at 4-5 (TAB 1st ROGs); Ex. 11 at 4 (TXSE 1st ROGs); *see* ECF No. 46-1.  None of those exhibits make fraud a disputed factual issue.  Of the 27 documents, three are blog posts and one is a newspaper editorial complaining about proxy advisors without identifying any "fraud" (Exs. 1, 2, 18, 8); nine are ISS documents in

---

[13] For example, for a 2023 shareholder meeting, ISS recommended under its Benchmark Policy to vote AGAINST a shareholder proposal asking the company to adopt a medium-term Scope 3 GHG reduction target, but FOR the same proposal under ISS' Climate Specialty Policy.  Ex. 65 at 1-2, 39-41 (Benchmark Policy Recs., 5/31/2023 Exxon Mobil Corp. meeting); Ex. 66 at 1-3, 46-48 (Climate Specialty Policy Recs., 5/31/2023 Exxon Mobil Corp. meeting); Ex. 19 at 8, 16-17 (Climate Specialty Policy).  For a 2022 shareholder meeting, ISS recommended under its Benchmark Policy to vote FOR the board's directors, while recommending under the Catholic Specialty Policy to vote AGAINST the same directors.  Ex. 67 at 1-2, 15-18 (Benchmark Policy Recs., 5/25/2022 Exxon Mobil Corp. meeting); Ex. 68 at 1-2, 18-27 (Catholic Specialty Policy Recs., 5/25/2022 Exxon Mobil Corp. meeting); Ex. 20 at 15 (Catholic Specialty Policy).

which Intervenors have not identified "fraud" (Exs. 3, 5, 11, 12, 13, 20, 23, 25, 26); seven are Glass Lewis documents or complain about Glass Lewis only (Exs. 4, 6, 7, 9, 10, 21, 27); two provide general background information (Exs. 14, 19); one is a research paper comparing U.S. and European laws that does not mention proxy advisors (Ex. 24); three are articles discussing the performance of "ESG funds" that also do not mention proxy advisors (Exs. 15, 16, 17); and one is a press release about a Florida investigation that postdates SB 2337's proposal (Ex. 22).

Indeed, it is unclear what Defendants even think is fraudulent. Intervenors refuse to define "financial analysis," which they insist "has a common, ordinary meaning in the English language." Ex. 14 at 4 (TAB 2nd ROGs); Ex. 15 at 4 (TXSE 2nd ROGs). And Paxton says that what qualifies as "financial analysis" depends on "context"; there is no "static, immutable" definition. Ex. 13 at 5 (Paxton 2nd ROGs). Invoking an undefined universe of statements and agreeing they are context dependent cannot create a genuine dispute of material fact. On top of that, Paxton's proffered definition of financial analysis also encompasses analysis that ISS plainly conducts[14]—yet Paxton does not explain how it can be "fraud" for ISS to describe the services it plainly offers. It can't.

At times, Defendants have suggested that ISS has made "representation[s]" to clients that following ISS' advice will "maximiz[e] returns, minimiz[e] risks." PI Hr'g Tr. 99; *see id.* at 84, 107. That's at least the rationale SB 2337 advances. *See* SB 2337 § 1(2)(B). But there is no triable fact on this issue: Defendants have pointed to nothing to support an "assumption" that following ISS' recommendation on any given proposal "is going to maximize returns and minimize risks." PI Hr'g Tr. 84. ISS does not purport to "quantify or model the financial impact

---

[14] *Compare* Ex. 13 at 5 (Paxton 2nd ROGs) ("financial analysis" includes "any type of consideration of financial data for decision making purposes," like "information taken from a company's financial statements . . . to help assess a company's financial health" or "performance"), *with* Ex. 64 at 4 (comparing public data on a company's "financial & operational performance" to "industry peers").

on company value" of a particular vote recommendation. Ex. 16 at 6. Nor is it clear how any advisor could attempt to predictably quantify the "financial impact" on stock returns of a vote for one director on the company board over another, a vote to ratify or reject a particular auditor, or a vote for or against a nonbinding shareholder proposal that the company can ignore even if it passes. *See* Third Kelly Decl. ¶ 8 (voting decisions "frequently involve qualitative issues that do not lend themselves to quantification"). Perhaps that is why there is no rule requiring company issuers, shareholder proponents, or solicitors of proxy votes to "quantify the financial impact" of proxy voting proposals, even though all of those entities would be better situated than ISS to try to do so.

Feasibility aside, ISS is not in the business of predicting stock returns. ISS does not guarantee that following its advice will produce any particular result: ISS is clear its reports are "provided for informational purposes only," and ISS "makes no express or implied warranties or representations with respect to the information in, or any results to be obtained by the use of, the report." Ex. 64 at 59; *see* ECF No. 14-1 at 27. ISS also cautions that "clients must determine whether and how to incorporate research or ratings into their investment decision-making process." ECF No. 42-2 pdf.144 [Ex. 15]. Intervenor TAB has, by contrast, urged that following TAB's views on social issues like hiring felons will "[i]ncrease your return on investment." Ex. 59 (TAB, Second Chance Hiring, https://perma.cc/W8TY-BDXV). That the Legislature is not targeting TAB further indicates Texas's anti-fraud rationale here is a pretext for targeting disfavored speech.

Whatever version of Texas's anti-fraud interest Defendants may try to offer, the Legislature had no evidence of it and thus could not have enacted SB 2337 in response to it. *See Stock v. Gray*, 773 F. Supp. 3d 733, 753 (W.D. Mo. 2025) (even a "possibly compelling state interest is insufficient" when "nothing in the record indicates that before enacting the law the [state] legislature possessed any evidence" of "real" harms). The ISS clients the Legislature heard from

18

expressed their satisfaction with ISS' services. *See supra* p. 4. It appears the bill sponsors used the term "fraud" when what they *really* meant was "advice I don't like."[15] But it is not "fraud" to give advice based on investors' chosen criteria or different advice to "different investors [that] have different investment styles, risk tolerances, investment horizons, and preferences." Ex. 7 (5/27/2025 Tr. 5-6) (Rep. Goodwin). As Paxton previously recognized in defending the speech rights of corporate issuers, "[s]imply labeling" activities as " 'fraud,' of course, will not carry the day"—and it "certainly raises the specter that the Government is effectively driving certain ideas or viewpoints from the marketplace." Texas Br., 2018 WL 5298251, at *4, *7 (cleaned up). Paxton was right then, and there is no genuine dispute otherwise.

### 2. SB 2337 Is Not Tailored To Texas's Supposed Anti-Fraud Interest.

Texas's purported anti-fraud interest is also fatally flawed on tailoring: Paxton has not and cannot show a triable issue over whether the "curtailment of [ISS'] free speech" is "actually necessary" to preventing fraud on Texas clients of proxy advisors, *Brown*, 564 U.S. at 799; *see Free Speech Coal.*, 95 F.4th at 283-284 (under intermediate scrutiny, a law cannot be "more extensive than is necessary to serve" the state's interest; the state must prove it "will in fact alleviate the harms" identified "to a material degree") (cleaned up); *NIFLA*, 585 U.S. at 776-777 (under *Zauderer*, a law cannot be "wholly disconnected" from the state's interest, "broader than reasonably necessary," or "curiously narrow") (citation omitted). Most critically, although the government can prohibit fraud outright, *see supra* p. 14-15 n.3, the First Amendment forbids States from adopting "broad prophylactic rules" on speech "lacking any nexus to the likelihood that the

---

[15] *See, e.g.*, Ex. 4 (4/24/2024 Tr. 54-55) (Sen. Hughes) (advisors "are basing their advice on ESG standards, other times on DEI priorities" and giving "different" clients "differing advice . . . We believe this is fraudulent behavior"); Ex. 6 (5/8/2025 Tr. 20) (Sen. Hughes) (similar); Ex. 8 (5/28/2025 Tr. 9-10, 13-14) (Rep. Leach) ("The fraud is occurring where proxy advisory firms . . . [are] advising one company one way and another company another way on the same vote, on the same issue based on non-economic factors.").

[speech] is fraudulent," *Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 619 (2003) (cleaned up). A "prophylactic rule of compelled speech" is by definition "not narrowly tailored." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 798 (1988).

There is no genuine dispute that SB 2337 is "seriously overinclusive" as a fraud-prevention measure and thus fails on tailoring no matter the standard. *See Brown*, 564 U.S. at 804-805; *NIFLA*, 585 U.S. at 777. The law applies regardless of what ISS clients have asked ISS to consider, regardless of any risk a client will be misled or confused as to the nature of ISS' services, and regardless of where clients are located, proxy advice is dispensed, or proxy votes take place—even if none of that occurs in Texas. A law that is admittedly "not limited to proxy advisory services to clients based in Texas," ECF No. 67 at 2, is too blunt a tool to advance the legislature's aim of protecting investors "*in this state* [that] hire professionals to provide advice," SB 2337 § 1(1) (emphasis added). Indeed, ISS has identified just *eight* Texas-based clients with custom policies, yet SB 2337 would compel ISS' speech to all *400* of its custom clients around the world if ISS speaks to them about Texas companies. First Kelly Decl. ¶ 25; Third Kelly Decl. ¶ 4.

Paxton has also not shown that compelling additional speech by ISS to third parties like the Texas Attorney General and Texas companies that are the subject of ISS' advice is necessary to prevent fraud on Texas institutional investors.[16] Proxy ballot issues are public; companies can and already do "provide relevant information to shareholders" in advance of those votes. SB 2337 § 1(5); *see* ECF No. 42-3 pdf.31, 104-107, 135-137, 147-150 [Exs. 25, 27, 33, 35]. The Texas Legislature found only that Texas companies "*may* have information" that "*may* prevent fraudulent or deceptive practices," SB 2337 § 1(5) (emphases added); even if none exist, SB 2337 applies

---

[16] *E.g.*, Ex. 30 (association of institutional investors comment letter opposing proposal to require proxy advisors to provide their recommendations to subject companies).

regardless.[17]  SB 2337 is also "wildly underinclusive" as a fraud-prevention measure, which is "alone enough to defeat it."  *Brown*, 564 U.S. at 802; *see NIFLA*, 585 U.S. at 773-774, 777 (same, for intermediate scrutiny and *Zauderer*).  "[U]nderinclusiveness" is a problem because it "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."  *NIFLA*, 585 U.S. at 774 (quoting *Brown*, 564 U.S. at 802).  That is the case here:  Even accepting SB 2337 as a fraud-prevention measure, there is no genuine dispute that the law is seriously underinclusive because it leaves unregulated advice about companies located anywhere but Texas.  ISS recommendations about Tesla trigger SB 2337's compelled speech; recommendations about companies like Walmart, Amazon, or Microsoft do not.  A "law cannot be regarded as protecting an interest of the highest order" "when it leaves appreciable damage to that supposedly vital interest unprohibited."  *Reed*, 576 U.S. at 172 (citation omitted); *see NIFLA*, 585 U.S. at 774-775, 777 (similar, for intermediate scrutiny and *Zauderer*).

SB 2337 is also riddled with content- and speaker-based exceptions, underscoring the "disconnect between its stated purpose and its actual scope."  *NIFLA*, 585 U.S. at 775.  Broad exceptions for advice that concurs with the company board or is identical across clients undermine Texas's purported aims.  Ex. 2 (10/17/2024 Tr. 130) (Sen. Hughes) ("[v]oting with management" could thwart "good shareholder resolutions to improve the company").  SB 2337 also "covers a curiously narrow subset of speakers," *NIFLA*, 585 U.S. at 777; *see supra* p. 12; ECF No. 42-3 pdf.168-171 [Ex. 39].  Even under *Zauderer*, the First Amendment is "deeply skeptical of laws that distinguish among different speakers," which "risk that the State has left unburdened those speakers

---

[17] Defendants' report doesn't endorse SB 2337's anti-fraud rationale; it instead generally opines on its dissatisfaction with proxy advisors.  But its laundry list of gripes with ISS—not making recommendations public, supposedly not showing its work, supposed conflicts of interest, a supposed worker shortage, and not being a fiduciary in the same way asset managers are, Ex. 18 (Defs. Rep. ¶¶ 15, 16, 18-21)—are not addressed by SB 2337.

whose messages are in accord with its own views." *NIFLA*, 585 U.S. at 777-778 (cleaned up).[18]

Finally, Paxton admits the Legislature never "consider[ed] any less restrictive alternatives," PI Hr'g Tr. 93, which is fatal under either strict or intermediate scrutiny. *Sorrell*, 564 U.S. at 571-572, 575. "In contrast to the prophylactic, imprecise, and unduly burdensome rule the State has adopted to reduce its alleged [investor] misperception, more benign and narrowly tailored options are available." *Riley*, 487 U.S. at 800. For example, Texas can "vigorously enforce" its existing antifraud laws. *Id.* Texas can "express [its] view" about good proxy advice "through its own speech." *Sorrell*, 564 U.S. at 578-579; *see Free Speech Coal.*, 95 F.4th at 284 ("obvious less-burdensome alternatives" include "a government-funded public information campaign") (citation omitted). Texas may dictate what state entities like TRS and ERS can consider in proxy voting, or terminate those clients' contracts with ISS. That Texas has done none of this—and apparently didn't even "consider" it—ends the analysis as a matter of law.

### 3. Paxton's Other Asserted Interests Are Illegitimate.

Paxton's various other asserted interests are not legitimate—let alone compelling—and only underscore that SB 2337's true aim is to stifle speech the Texas Legislature dislikes. Paxton's professed interest in ensuring that "shareholders can receive [multiple] perspectives," ECF No. 23-1 at 25, embodies an objective "to correct the mix of speech" or "yield[] greater balance in the marketplace of ideas" that "the government may not pursue." *Moody v. NetChoice, LLC*, 603 U.S.

---

[18] Even if *Zauderer* applied, Paxton cannot prove SB 2337 is not "unduly burdensome." *NIFLA*, 585 U.S. at 776. SB 2337 "imposes a government-scripted, speaker-based disclosure requirement that is wholly disconnected from" any ostensible interest in protecting sophisticated investors from fraud. *Id.* at 777. It is undisputed that the "detail required" to comply with SB 2337 "effectively rules out" speech, *id.* at 778 (citation omitted); *see* Second Kelly Decl. ¶¶ 3-5 ("impossible" for ISS to comply). Intervenors' counsel recognize the obvious chill: SB 2337 "will meaningfully increase the cost of compliance for proxy advisors" and thus "decrease the frequency with which proxy advisors make voting recommendations in opposition to management." ECF No. 42-3 pdf.189-190 [Ex. 42].

707, 740-742 (2024). Such an interest is "not valid, let alone substantial," even under a "less stringent form of First Amendment review." *Id.* Paxton's other proffered interests are similarly connected to "the suppression of free expression." *Id.* at 742 (citation omitted). There is no neutral reason why having SB 2337 on the books would "[p]romot[e] Texas as a destination for corporate relocation." Ex. 13 at 4 (Paxton 2d ROGs) The only explanation is that Paxton thinks chilling proxy advisors' speech about Texas companies will incentivize companies to move to Texas. *Cf.* ECF No. 42-2 pdf.59 [Ex. 3] ("Silencing the proxy advisory firms has been on the wish-list of corporate management and their trade associations and lobbying organizations for years").

### C. Paxton Cannot Demonstrate That Any Exception To Strict Scrutiny Applies.

As demonstrated above, SB 2337 does not survive any standard of scrutiny. But Paxton also cannot show at summary judgment that a commercial-speech exception to strict scrutiny applies.[19] *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022) (defendants have "burden of proving" strict scrutiny does not apply because affected speech is "outside of the category of [completely] protected speech") (citation omitted). Defendants cannot establish a genuine dispute over whether SB 2337 regulates only commercial speech or if, even if the law did, SB 2337 compels just "purely factual and uncontroversial information." *Zauderer*, 471 U.S. at 651. As a matter of law, SB 2337 does neither.

### 1. Paxton Cannot Show SB 2337 Regulates Commercial Speech.

The fact that ISS receives compensation for its speech does not make that speech less protected. *See Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989) ("Some of our most valued forms of fully protected speech are uttered for a profit."). "Commercial speech is expression related solely to the economic interests of the speaker and its audience" or "speech

---

[19] ISS agrees with Intervenors (ECF No. 46 at 12) that the commercial-speech carveout from strict scrutiny is untenable and should be reexamined.

which does no more than propose a commercial transaction." *Book People II*, 91 F.4th at 339 (cleaned up). Paxton has conceded that ISS' speech does more than propose a commercial transaction. *See* ECF No. 23-1 at 20. And when ISS advises existing clients on matters of public concern on issues like executive pay and climate change disclosures, ISS is not speaking "solely [in] the economic interests of [ISS] and its audience." *Book People II*, 91 F.4th at 339 (citations omitted). ISS is paid regardless of the contents of its ultimate recommendation, and ISS is clear that it "does not . . . make buy, sell or hold investment recommendations to clients." ECF No. 42-2 pdf.150 [Ex. 15]. ISS' speech to its clients is not an advertisement. *See NIFLA*, 585 U.S. at 771; *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983). And ISS' speech is not of a "mundane commercial nature"; it has "stir[red] the passions of many." *See Harris v. Quinn*, 573 U.S. 616, 648 (2014) (citation omitted).[20]

Even if SB 2337 applies to commercial speech in some way, Paxton cannot dispute that any commercial aspect is "inextricably intertwined" with "otherwise fully protected speech." *Riley*, 487 U.S. at 796. ISS' advice and recommendations are "informative and perhaps persuasive," *see id.* (citation omitted); they are "especially necessary when the vote requires in-depth analysis, as in areas of executive compensation, conflicted transactions, or contested situations," and "reduce the costs of voting for previously under-informed investors." Ex. 62 (Kobi Kastiel & Yaron Nili, *Competing for Votes*, 10 Harv. Bus. L. Rev. 287, 332 (2020)).[21] Yet SB

---

[20] *E.g.*, ECF No. 42-3 pdf.30 [Ex. 25] ("Corporate managers dislike the large proxy advisors . . . because of the voting advice they give."); Ex. 60 (Marco Quiroz-Gutierrez, *With $1 Trillion Pay Package On The Line, Elon Musk Blasts Influential Firms Telling Shareholders To Reject It: 'Those Guys Are Corporate Terrorists'*, Fortune Magazine (Oct. 23, 2025)).

[21] *See also, e.g.*, ECF No. 42-3 pdf.25-30 [Ex. 25]; ECF No. 42-2 pdf.26 [Ex. 1] (SEC Investor Advisory Committee) ("proxy advisor services are highly valuable"); ECF No. 42-2 pdf.40 [Ex. 2] (state retirement fund "rel[ies] on proxy advisors" for cost-effective research); Exs. 31 & 32 (association of institutional investors explaining that proxy advisors are important to "[p]reserving investor choice and access to independent research").

2337 would require ISS to disclaim that speech as contrary to shareholders' financial interests—fundamentally altering ISS' message. That hijacking forecloses calling SB 2337 a commercial speech regulation as a matter of law. *See X Corp.*, 116 F.4th at 901 (not commercial speech where law would "require a company to recast its" speech "in language prescribed by the State").[22]

### 2. Paxton Cannot Show That SB 2337 Satisfies *Zauderer*.

Even if ISS' speech were commercial, Paxton cannot establish a triable fact over whether SB 2337 merely requires disclosure of "purely factual and uncontroversial information about the terms under which . . . services will be available." *Zauderer*, 471 U.S. at 651.

Forcing ISS to say it "subordinates" financial interests is not "purely factual." It is an opinion—and one that ISS does not share. *See* 57 Fed. Reg. at 48,278 ("the desirability of a particular initiative subject to a shareholder vote is by its nature judgmental"). Not only that, SB 2337's premise is utterly false and thus controversial: A wide variety of speakers hold the opinion that these factors can be material. *See supra* p. 10. That different States are on opposite sides reflects at least a "good-faith dispute," which renders *Zauderer* inapplicable. *Free Speech Coal.*, 95 F.4th at 282; *see also* Ex. 17 (Evans Rep. ¶ 47) ("substantial disagreement among investors").

Moreover, SB 2337 compels speech on inherently "controversial topic[s] of debate throughout the country." *Book People II*, 91 F.4th at 340 n.127; *see* ECF No. 42-3 pdf.2 [Ex. 24]. What makes for "good" proxy advice is itself a subject of widespread debate. And the Supreme

---

[22] Paxton's attempted analogy to securities laws is also wrong: States may not regulate "otherwise protected speech using the guise of securities laws." *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 372 (D.C. Cir. 2014), *adhered to on reh'g in relevant part*, 800 F.3d 518 (D.C. Cir. 2015); *see* ECF No. 28 at 8-10. Even Paxton agrees: Asserting a state interest in the "prevention of securities fraud . . . does not save [it] from being 'a facade for viewpoint-based discrimination.'" Texas Amicus Br., 2018 WL 5298251, at *6 (citation omitted). In any case, regulations of "issuers of and dealers in securities," ECF No. 28 at 9, are inapposite here: ISS does not issue, sell, or trade securities, or even advise others to do so. *See supra* p. 3. SB 2337 regulates ISS' "speech as speech," meaning strict scrutiny applies. *NIFLA*, 585 U.S. at 770.

Court has recognized that "controversial subjects such as climate change"—a frequent subject of ISS' advice and target of SB 2337—are "sensitive political topics" that "occup[y] the highest rung of the hierarchy of First Amendment values." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 913-914 (2018) (citations omitted).  Defendants agree: "Climate change is the subject of legitimate international debate," Texas Amicus Br., 2018 WL 5298251, at *13, and speech about "a company's climate-related risks and emissions [is] 'anything but an uncontroversial topic,'" TAB Reply Br., *Chamber of Commerce v. SEC*, Nos. 24-1628, 24-2173, 2024 WL 4468617, at *31 (8th Cir. Oct. 1, 2024) (quoting *NIFLA*, 585 U.S. at 769).  Because SB 2337 compels speech on controversial topics, *Zauderer* cannot apply as a matter of law.

## II.     SB 2337 Is Unconstitutionally Vague As Applied To ISS.

A law is unconstitutionally vague under the Fourteenth Amendment's Due Process Clause if it (1) fails to give "fair notice of conduct that is forbidden or required," *or* (2) "authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation omitted).  SB 2337 is unconstitutional either way; as a matter of law, it cannot survive the "stringent" test applicable here. *Book People III*, 2025 WL 3035109, at *7.

### A.     SB 2337's Maze Of Requirements Leaves ISS Guessing How To Comply.

SB 2337 is unconstitutionally vague because people of "common intelligence must necessarily guess at its meaning and differ as to its application."  *Fox*, 567 U.S. at 253 (citation omitted).  SB 2337 is vague both on the front end—in what triggers the law's burdensome obligations—and on the back end—in what ISS must do to comply.  *See* First Kelly Decl. ¶ 44.

*On the front end*, SB 2337 is vague about the conduct triggering its application.  Vagueness "plague[s] [the law's] first filtering steps." *Book People III*, 2025 WL 3035109, at *8.  It is unclear whether SB 2337 reaches ISS' services outside the context of voting recommendations, such as risk assessment tools, ratings, research and analysis, and thought leadership.  *See* SB 2337

§ 6A.001(4)(C); ECF No. 28 at 18-19. Even in the context of voting recommendations, it is unclear if SB 2337 applies recommendation-by-recommendation or to ISS' report as a whole: If ISS recommends voting with the company board on one issue but against the board on another, is the entire report tainted—or are the mandated warnings limited only to the vote-against recommendation? SB 2337 §§ 6A.101(a)(2), (4), 6A.102(a)(3). And at what point are the mandated warnings triggered—when ISS is mid-"research and analysis" or "development," *id.* § 6A.001(4)(B), (C), or only when ISS reaches a final outcome? The requisite nexus to Texas is likewise fuzzy: SB 2337 applies to services "provided *in connection with or in relation to* a [Texas] company," *id.* § 6A.001(4) (emphasis added), yet the law offers zero guidance about whether it applies if a Texas company forms some input in ISS' services, such as participating in a survey used to develop a voting policy, *see id.* § 6A.001(4)(D); First Kelly Decl. ¶ 30, or serving as an "industry peer" in a recommendation about a non-Texas company, *see supra* p. 17 n.14.

SB 2337 also "fails to define key categories." *Students Engaged in Advancing Tex. v. Paxton*, 765 F. Supp. 3d 575, 602 (W.D. Tex. 2025); *see* First Kelly Decl. ¶ 44. A proxy advisory service is covered if it is "not provided solely in the financial interest of the shareholders" because it is "partly based on, or otherwise takes into account, one or more nonfinancial factors." SB 2337 § 6A.101(a), (b). But there is no "single, universally accepted definition for the term 'nonfinancial factor.'" Ex. 17 (Evans Rep. ¶ 27); *see SIFMA v. Ashcroft*, 745 F. Supp. 3d 783, 800 & n.10 (W.D. Mo. 2024) (holding the term "nonfinancial" unconstitutionally vague in similar context). The statute's non-exhaustive list of examples fail to clarify it: "ESG," "sustainability," and "DEI" are undefined. SB 2337 § 6A.101(a)(1). There is no universal definition.[23] *See* Ex. 2 (10/17/2024

---

[23] Compounding confusion, SB 2337 deems these factors *per se* "nonfinancial" *even if* they were part of advice designed to mitigate "risk"—which SB 2337 recognizes as *in* shareholders' financial interests. *See* SB 2337 § 6A.101(a)(3), (b)(1)(B); *cf.* ECF No. 42-3 pdf.118-119 [Ex. 30].

Tr. 103) (defining ESG is "like nailing Jello to the wall"; "there are different definitions, depending on who you talk to"); Ex. 2 (10/17/2024 Tr. 106) (similar); Ex. 17 (Evans Rep. ¶ 27 & n.52). And Paxton's discovery definitions of these terms—as "not necessarily limited to" a laundry list of considerations, Ex. 12 at 5-6 (Paxton 1st ROGs)—proves they are amorphous as a matter of law. *See Book People III*, 2025 WL 3035109, at *8 (law is unconstitutionally vague if its "multi-prong definitions" requires people "to apply a uniquely crafted test" "without commonly accepted guidance or precedent"); *Nat'l Educ. Ass'n-N.H. v. NH Att'y Gen.*, __ F. Supp. 3d __, 2025 WL 2807652, at *15 (D.N.H. 2025) (Oct. 2, 2025) (numerous courts "have struck down similar anti-DEI laws as void for vagueness").[24]

***On the back end***, SB 2337 does not tell ISS with reasonable specificity what it must do to avoid punishment. Many requirements incorporate the terms "financial" or "nonfinancial," which are vague for the same reasons the triggering conditions are. SB 2337 §§ 6A.101(b), 102(b). And the law does not explain what counts as a "conspicuous[]" disclosure, *id.* § 6A.101(b)(1)(A), (3); how quickly ISS must act to "immediately" provide disclosures to Texas companies,[25] *id.*

---

[24] Other triggering conditions likewise depend on the terms "financial" or "nonfinancial" and thus suffer from the same vagueness. SB 2337 §§ 6A.101(a)(2)-(4), (b), 6A.102(b). And other front-end vagueness problems abound—like whether all ISS clients have "expressly requested services for a nonfinancial purpose"—such that Section 6A.102(b) would not apply—because ISS' Benchmark and Specialty Policies clearly consider governance factors. Or what ISS should do if it isn't possible to offer a "projected quantifiable impact" of a proposal. *Id.* § 6A.101(a)(2), (c). What counts as "simultaneously" advising multiple clients, *id.* § 6A.102(a), when the timing of reports differ? Is advice "inconsistent" with the board when the board offers no recommendation? *Id.* § 6A.101(a)(2); *see* Ex. 64 at 2, 43. Is advice "against" a proposal if ISS advises an abstention—and does it depend on how the particular company's bylaws treat abstentions? SB 2337 §§ 6A.101(a)(4), 6A.102(a)(1)-(3); *compare* Ex. 64 at 18 (abstentions count as "against" votes), *with* Ex. 65 at 18 (abstentions not counted). It's also unclear if the law applies to shareholder proposals that are not included on a company's proxy statement. *Compare* SB 2337 § 6A.001(5), *with id.* § 6A.101(a)(2), (c); *see* 17 C.F.R. § 240.14a–4(c).

[25] *Amicus* Alliance for Corporate Excellence's president and counsel say without explanation that "immediately" means "within 24 hours." Ex. 63 (Christopher J. Babcock, *et al.*, Foley Corporate Governance Update (June 3, 2025), https://perma.cc/R9GF-GKSH); ECF No. 34 at 4-5.

§ 6A.102(b)(2); how much "particularity" is required or what to do if the service in question does not "concern[ ] [a] recommendation," *id.* § 6A.101(b)(1)(B), or how and to whom ISS could provide a disclosure "to the [Texas] company that is the subject of the service," *id.* § 6A.101(b)(2), if ISS' services did not focus on any particular company. These "many important questions are left unanswered and unaddressed by the statute," *Book People I*, 692 F. Supp. 3d at 698, with severe consequences for ISS if it guesses wrong about how to comply. SB 2337's failure to define its liability-assigning terms warrants summary judgment for ISS on its due process claim.

### B. Paxton Guarantees Arbitrary Enforcement.

SB 2337 is unconstitutionally vague for the independent reason that it "encourages arbitrary and discriminatory applications"—it depends on "ad hoc judgments which can vary" across potentially regulated entities. *Book People III*, 2025 WL 3035109, at *8. And it exposes ISS to potentially existential "sanctions based not on [ISS'] own objective behavior, but the subjective viewpoints of others," *Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001)—namely, the Texas Attorney General's "personal predilections." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (citation omitted); *see Students Engaged*, 765 F. Supp. 3d at 602; *NAACP v. DOE*, 779 F. Supp. 3d 53, 66-67 (D.D.C. 2025) (law is unconstitutionally vague where its "lack of clarity" "makes unavoidable" that its "contours" will be shaped through "enforcement decisions"). "Anti-ESG" proxy advisors like Strive are unlikely to comply with SB 2337's punishing demands, and yet may take comfort that Paxton is unlikely to enforce SB 2337 against them. *See* ECF No. 14 at 18-19; ECF No. 42-3 pdf.172-184 [Exs. 40-41]. As a matter of law, where "inherently vague statutory language permits such selective law enforcement, there is a denial of due process." *Smith v. Goguen*, 415 U.S. 566, 576 (1974).

### C. The Resulting Uncertainty Chills ISS' Protected Speech.

SB 2337's vagueness has an "obvious chilling effect" on ISS' speech. *Fox*, 567 U.S. at

254-255 (citation omitted). That vagueness is "particularly troublesome given the penalties for failure to comply." *Ashcroft*, 745 F. Supp. 3d at 801. Any misstep on SB 2337's labyrinthian requirements "triggers extensive liability," Ex. 7 (5/27/2025 Tr. 16), including civil penalties of $10,000 per violation, which could quickly add up to a staggering sum. *See* Tex. Bus. & Com. Code § 17.47(c)(1). "First Amendment freedoms need breathing space to survive," but SB 2337's "complicated and intricate scheme" backed by ruinous fines dissuades proxy advisors like ISS from speaking about Texas companies at all. *See Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 604 (1967). That, after all, was the point: "to prevent" advice the Texas Legislature does not like. Ex. 7 (5/27/2025 Tr. 22) (Rep. Leach).

### III.    ISS Is Entitled To A Permanent Injunction.

ISS has established success on the merits, for all the reasons discussed above. Like the *Book People* plaintiffs, ISS is entitled to a permanent injunction. *Book People III*, 2025 WL 3035109, at *3 (explaining four-part test). This is so for all the same reasons ISS was entitled to a preliminary injunction. ECF No. 14 at 19-20. Indeed, an injunction has become only more appropriate. Intervenors have refused to disclose that any of their members are harmed by ISS' speech; Paxton has disclosed that no one, other than counsel, has knowledge of any false statements made by ISS; and Defendants have let the PI stand while pressing for an extension in this case. These facts underscore the lack of harm in permanently enjoining SB 2337.

### CONCLUSION

The Court should enter summary judgment for ISS and permanently enjoin Defendant Attorney General Paxton and his successors, agents, employees, and all persons acting under his direction or control from taking any action to enforce SB 2337 against ISS, *see* SB 2337 § 6A.201, including but not limited to intervention in any private right of action, *see id.* § 6A.202(b).

Respectfully submitted,

/s/ Bruce D. Oakley

JESSICA L. ELLSWORTH*
  jessica.ellsworth@hoganlovells.com

DAVID M. FOSTER*
  david.foster@hoganlovells.com

JAMES YATES*
  james.yates@hoganlovells.com

MICHAEL J. WEST**
  michael.west@hoganlovells.com

DANA A. RAPHAEL*
  dana.raphael@hoganlovells.com

J. ANDREW MACKENZIE (Texas Bar No.
  24138286)
  drew.mackenzie@hoganlovells.com

HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel: (202) 637-5600
Fax: (202) 637-5910

BRUCE D. OAKLEY (Texas Bar No. 15156900)
  bruce.oakley@hoganlovells.com

LACY G. BROWN (Texas Bar No. 24080906)
  lacy.brown@hoganlovells.com

HOGAN LOVELLS US LLP
609 Main Street, Suite 4200
Houston, TX 77002
Tel: (713) 632-1420
Fax: (713) 632-1401

* admitted pro hac vice
** pro hac vice forthcoming

*Counsel for Plaintiff Institutional Shareholder Services Inc.*

Dated:  December 9, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2025, I electronically filed the foregoing using the CM/ECF system, which will send notification of this filing to the attorneys of record.

/s/ Bruce D. Oakley
Bruce D. Oakley